IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA


KEVIN RAY UNDERWOOD,       )
                                   )
       Petitioner,           )
                                   )
vs.                                )        Case No. CIV-12-111-D
                                 )
KEVIN DUCKWORTH, Interim Warden,   )
    Oklahoma State Penitentiary,     )
                                 )
       Respondent.[1]     )

## MEMORANDUM OPINION

Petitioner, a state court prisoner, has filed a petition for writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 19. Petitioner challenges the conviction entered against him in Cleveland County District Court Case No. CF-07-513.[2] Tried by a jury in 2008, Petitioner was found guilty of first degree murder and sentenced to death. In support of his death sentence, the jury found one aggravating circumstance, namely, (1) the murder was especially heinous, atrocious, or cruel. Criminal Appeal Original Record (hereinafter "O.R.") 8, at 1508.

Petitioner has presented eleven grounds for relief. Respondent has responded to the petition and Petitioner has replied. Docs. 19, 32, and 45. In addition to his petition, Petitioner has filed motions for discovery and an evidentiary hearing. Docs. 20 and 27.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Kevin Duckworth, who currently serves as interim warden of the Oklahoma State Penitentiary, is hereby substituted as the proper party respondent in this case.
[2] Petitioner was originally charged in McClain County, under Case No. CF-06-102. The trial court granted a request to change venue, and transferred the case to Cleveland County.

After a thorough review of the entire state court record (which Respondent has provided), the pleadings filed in this case, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to his requested relief.

## I. Procedural History.

Petitioner appealed his conviction and sentence to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). The OCCA affirmed in a published opinion. *Underwood v. Oklahoma*, 252 P.3d 221, 258-59 (Okla. Crim. App. 2011). Petitioner sought review of the OCCA's decision by the United States Supreme Court, which denied his writ of certiorari on January 18, 2011. *Underwood v. Oklahoma*, 132 S. Ct. 1019 (2012). Petitioner also filed a post-conviction application, which the OCCA denied in an unpublished opinion. *Underwood v. Oklahoma*, No. PCD-2008-604 (Okla. Crim. App. Jan. 17, 2012).

## II. Facts.

In adjudicating Petitioner's direct appeal, the OCCA set forth a summary of the facts. Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." Although this presumption may be rebutted by Petitioner, the Court finds that Petitioner has not done so, and that in any event, the OCCA's statement of the facts is an accurate recitation of the presented evidence. Thus, as determined by the OCCA, the facts are as follows:

> [Petitioner] was charged with murdering ten-year-old Jamie Bolin on April 12, 2006, in Purcell, Oklahoma. [Petitioner] lived alone in the same apartment complex where Jamie lived with her father, Curtis Bolin. Due to her father's work schedule, Jamie was typically home alone for a period of time after school. On the day in question, Jamie played in the school library

with a friend for a short time before going home. She was never seen alive again.

Police, firefighters, and a host of citizen volunteers began a search for Jamie. The day after Jamie's disappearance, the Federal Bureau of Investigation added over two dozen people to the effort. On April 14, 2006, two days after Jamie was last seen, police set up several roadblocks around the apartment complex where she lived, seeking leads from local motorists. Around 3:45 p.m. that day, FBI Agent Craig Overby encountered a truck driven by [Petitioner's] father at one of the roadblocks; [Petitioner] was a passenger in the truck. [Petitioner's] father told Overby that they had heard about the disappearance, and that in fact, [Petitioner] was the girl's neighbor. From speaking with other neighbors at the apartment complex, Overby knew that a young man living there may have been the last person to see Jamie. Overby asked if [Petitioner] would come to the patrol car to talk for a moment, and [Petitioner] agreed, while his father waited in the truck. In the patrol car, [Petitioner] made statements that piqued Overby's interest. [FN3] Overby asked [Petitioner] if he would come to the police station for additional questioning. Again, [Petitioner] agreed, and Overby assured [Petitioner's] father that he (Overby) would give [Petitioner] a ride home.

FN3.  At trial, Overby testified: "He told me that he was afraid that he was considered a suspect because he'd been hanging around outside his apartment a lot during the last couple of weeks.... He said he was the last person to see Jamie before she disappeared, and that  t h e  media reports of the clothing that she was wearing when she  b e c a m e  missing were incorrect."

At the police station, [Petitioner] was interviewed by Agent Overby and Agent Martin Maag. [Petitioner] told them about seeing Jamie on  April 12, and discussed his activities on that day and other matters. At the conclusion of this interview, which lasted less than an hour, the agents asked [Petitioner] if they could search his apartment. [Petitioner] agreed. The agents accompanied [Petitioner] to his apartment around 5:00 p.m. While looking around the apartment, Overby saw a large plastic storage tub in [Petitioner's] closet; its lid was sealed with duct tape. [Petitioner] saw Overby looking at the tub, and volunteered that he kept comic books in it; he said that he had taped the lid to keep moisture out. Overby asked if he could look inside the tub, and [Petitioner] agreed. When Overby pulled back a portion of the tape and lifted a corner of the lid, he saw a girl's shirt—and realized that it matched [Petitioner's] description of the shirt Jamie Bolin was wearing on the day she disappeared.  [FN4]  When Overby

commented that he saw no comic books in the tub, [Petitioner] interjected, "Go ahead and arrest me." Overby immediately responded, "Where is she?" [Petitioner] replied, "She's in there. I hit her and chopped her up." [Petitioner] then became visibly upset, began hyperventilating, and exclaimed, "I'm going to burn in Hell." He was placed under arrest and escorted out to the agents' vehicle. Agent Overby summoned local authorities to secure the scene.

FN4. Overby testified: "[D]uring the earlier interview, Mr. Underwood told me that the media reports about what Jamie was last seen wearing were wrong, that he had actually seen her wearing a    b l u e shirt. And then I saw the blue shirt inside the box or the tub."

Back at the police station, [Petitioner] was advised of his right to remain silent, and his right to the assistance of counsel during any questioning, consistent with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Because he asked for a lawyer, the interview was concluded. About fifteen minutes later (approximately 5:45 p.m.), police approached [Petitioner] and asked if he would reaffirm, in writing, his original verbal consent to a search of his apartment. [Petitioner] agreed, and spent the next few hours sitting in a police lieutenant's office. He conversed with various officers who were sent to guard him, and made some incriminating statements during that time.

Around 9:30 p.m. that evening, [Petitioner] asked to speak with the two FBI agents he had initially talked to (Overby and Maag). Because [Petitioner] had previously asked for counsel, OSBI Agent Lydia Williams visited with him to determine his intentions. Agent Williams reminded [Petitioner] that he had earlier declined to be questioned, and explained that because of that decision, police could not question him any further. [Petitioner] emphatically replied that he wanted to talk to the agents. Around 10:15 p.m., Agents Overby and Maag interviewed [Petitioner] at the police station. Before questioning began, Overby reminded [Petitioner] of his *Miranda* rights, and [Petitioner] signed a written form acknowledging that he understood them and waived them. When asked if anyone had offered him anything in exchange for agreeing to talk, [Petitioner] replied that one of the officers had predicted things would go better for him if he cooperated. Besides acknowledging his waiver of *Miranda* rights, [Petitioner] also signed another written consent to a search of his apartment. A video recording and transcript of the interview that followed, which lasted about an hour, was presented to the jury at trial and is included in the record on appeal.

In the interview, [Petitioner] describes how he had recently developed a desire to abduct a person, sexually molest them, eat their flesh, and dispose of their remains. He explains in considerable detail how he attempted to carry out this plan on Jamie Bolin, whom he had decided was a convenient victim. [Petitioner] stated that he invited Jamie into his apartment to play with his pet rat. Once Jamie was inside, [Petitioner] hit her on the back of the head several times with a wooden cutting board; she screamed in pain and begged him to stop. [Petitioner] proceeded to suffocate the girl by sitting on her and placing his hand across her face. [Petitioner] told the agents that this was not an easy task, and that fifteen to twenty minutes passed before she succumbed. [Petitioner] claimed he then attempted to have sexual relations with the girl's body, but was unable to perform. He then moved her body to the bathtub and attempted to decapitate it with a knife, but was unsuccessful at that task as well. Frustrated, [Petitioner] wrapped Jamie's body in plastic sheeting and placed it in a large plastic container which he hid in his closet. [Petitioner] also dismantled Jamie's bicycle and hid it inside his apartment, to make it look as if she had left the apartment complex.

Jamie Bolin's remains were taken to the Medical Examiner's office for an autopsy. The Medical Examiner noted bruises to the back of the girl's head, consistent with [Petitioner's] claim that he hit her forcefully with a cutting board. The examiner also noted petechia in the girl's eyes, and curved marks on her face, consistent with [Petitioner's] description of how he had suffocated her. The most pronounced wound on the body was a very deep incision to Jamie's neck, which was also consistent with the injuries [Petitioner] admitted to inflicting. The Medical Examiner also noted trauma to the girl's genital area, including tearing of the hymen. However, the Medical Examiner could not say that Jamie was alive, or even conscious, when her neck was cut or when she was sexually assaulted. The official cause of death was declared to be asphyxiation.

*Underwood*, 252 P.3d at 230-31.

### III.  Standard of Review.

#### A.      Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity.  It provides that before a federal court can grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies.  As acknowledged in *Coleman v. Thompson*, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

#### B.      Procedural Bar.

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman*, 501 U.S. at 729).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729-30.

## C.    Merits.

When a petitioner presents a claim to this Court, the merits of which have been addressed in state court proceedings, 28 U.S.C. § 2254(d) governs his ability to obtain relief.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (acknowledging that the burden of proof lies with the petitioner).  Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The focus of Section 2254(d) is on the reasonableness of the state court's decision.  "The question under AEDPA [Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  Relief is warranted only "*where there is no possibility* fairminded jurists

could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Id.* (emphasis added). The deference embodied in "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (citation omitted). When reviewing a claim under Section 2254(d), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

## IV. Analysis.

### A. Ground One: Ineffective Assistance of Counsel.

Petitioner alleges that his trial and appellate counsel were constitutionally ineffective for several reasons. Petitioner claims that trial counsel (1) failed to fully present mitigation evidence through lay witnesses; (2) failed to employ and properly utilize expert services, (3) failed to preserve the record via in-trial objections, (4) failed to raise a challenge to the execution of the mentally ill, (5) failed to rebut attacks on expert diagnoses, and (6) failed to rebut the medical examiner's testimony. Petition at 7-25. Petitioner claims that appellate counsel also failed to properly utilize expert services and failed to raise violations of the trial court's gag order on appeal.[3] *Id*. at 11-13, 20.

### 1. Clearly Established Law.

_____

[3] Petitioner additionally raises a more generalized appellate ineffectiveness argument, but that argument simply refers back to the claims more specifically set out in the Petition. Petition at 25-26. By addressing his specific appellate ineffectiveness claims, the Court has addressed any complaints Petitioner has raised about appellate counsel.

Counsel is constitutionally ineffective when counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). On habeas review, courts must apply the highly deferential standards of *Strickland* and the AEDPA to the facts of the case and decide whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 101, 105. Courts cannot disturb a state court's ruling unless the petitioner demonstrates that the state court applied the highly deferential *Strickland* test in a way that every fair minded jurist would agree was incorrect. *Id*.

Courts analyze counsel's performance for "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. The Supreme Court shuns specific guidelines for measuring deficient performance, as "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel, or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id*. at 688-89. Instead, courts must be highly deferential when reviewing counsel's performance, and the petitioner must overcome the presumption that the "challenged action[s] might be considered sound trial strategy." *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)) (internal quotation marks omitted).

If a petitioner can show deficient performance, he must then also show prejudice by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In Oklahoma, where the jury can only impose a death sentence unanimously, the question is whether there exists a

reasonable possibility "that at least one juror would have struck a different balance but for counsel's putative misconduct." *Wackerly v. Workman*, 580 F.3d 1171, 1176 (10th Cir. 2009) (quoting *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)) (internal quotation marks omitted). When evaluating omitted information, courts consider both the benefits and the negative effects of that information. *Id*. at 1178.

### 2. *Failure to fully present mitigation evidence through lay witnesses.*

During the penalty phase, defense counsel presented fourteen lay witnesses who testified to various aspects of Petitioner's personal, social, and family history. Trial Tr. vol. VIII, 1955-2147, vol. IX, 2383-95. Petitioner claims that counsel failed to fully develop the testimony of those witnesses, although counsel knew that the witnesses could share even more information. Petition at 8-9. Petitioner alleges that this "vanilla" presentation prevented the jury from hearing the totality of Petitioner's history and also created a disconnect between the evidence Petitioner's experts referenced and what the jury actually heard. *Id*. at 9-10.

Petitioner raised the issue on direct appeal. *Underwood*, 252 P.3d at 250, 253. Petitioner submitted affidavits and reports that reflected information not presented at trial, although the information came from four individuals who testified at trial, and one who defense counsel listed as a witness but never called. Appl. for Evidentiary Hr'g, *Underwood v. State*, No. D-2008-319, Exs. B-F.[4] The OCCA held that defense counsel

---

[4] This Court cannot consider the fourteen affidavits (Petition, Exs. 2-15) attached to the Petition, because this Court can only review the OCCA's legal decisions and factual findings based on the record that was before the OCCA. *Pinholster*, 563 U.S. at 181-82; 28 U.S.C. § 2254(d)(2). This

fully investigated and presented a comprehensive mitigation case, and declined to second-guess counsel's questioning. *Underwood*, 252 P.3d at 253.[5]

Petitioner's claim of deficient performance is not premised on a lack of investigation, but rather a lack of presentation. Petition at 7-8. Petitioner takes issue with defense counsel's decision to present certain information only in conjunction with expert testimony. *Id*. Therefore, rather than determining whether counsel conducted a thorough investigation, this Court analyzes whether counsel acted reasonably with the information that the investigation uncovered.

Petitioner claims that defense counsel did not elicit information at trial explaining that Petitioner was "different," his family had a history of mental illness, that his father ridiculed him, his mother had fits of rage, schoolchildren bullied him, he was not the same after high school, he experienced anxious fear and isolation in college, he took antidepressants, and his friends thought he acted differently based on whether he took those medications. *Id*.

---

Court will only consider affidavits that the OCCA considered.

[5] Petitioner attacks the OCCA's factual determinations on this issue, but the Petition is vague regarding which factual determinations Petitioner actually contests. Petitioner refers to a finding that counsel thoroughly investigated and prepared a comprehensive mitigation case, and complains that the OCCA did not consider that counsel must also present the evidence which the investigation uncovers. Petition at 10. This argument does not appear to contradict any factual finding by the OCCA. The record is quite clear that counsel conducted a thorough investigation, and Petitioner has failed to rebut the OCCA's finding on that issue.

Fourteen of the lay witnesses who testified consisted of family members, friends, co-workers, and teachers. *Underwood*, 252 P.3d at 253. These witnesses testified extensively about Petitioner's background, including much of the evidence that Petitioner claims his counsel omitted. Petitioner's cousin, friend, employer, and aunt all testified that he was "different." Trial Tr. vol. VIII, 1960-63, 2004, 2030-31, 2065. His father's ridicule was well supported by trial testimony from his cousin and friends. *Id.* at 1963-64, 1976, 2006-07. His mother's temper issues also came out in testimony. *Id*. at 1976-77, 2011, Trial Tr. vol. IX, 2394. Witnesses described Petitioner's encounters with bullying at length. Trial Tr. vol. VIII, 1960, 1975, 2005. His employer and aunt detailed the issues he faced in college. *Id*. at 2035, 2070. His doctor told of his prescription medications for depression. *Id*. at 2057-59. Petitioner discounts this testimony as merely "overviews" that present a "vanilla" version of Petitioner's life. Petition at 9. Even if this Court did assume that defense counsel presented a bland mitigation case, there is no clearly established federal law equating uninspired performance with constitutionally deficient performance. Petitioner had a constitutional right to a rigorous testing of evidence in an adversarial proceeding, not a dynamic presentation.

The purportedly omitted information—the history of mental illness, details of his mother's rage issues, and Petitioner's behavior when on his medications—also fail to show deficient performance on the part of defense counsel. While Petitioner allows no possible strategic reason for defense counsel to avoid those subjects with lay witnesses,

this Court must presume that counsel acted reasonably. The record supports that presumption.

Evidence of Petitioner's family history of mental health was sparse. Petitioner's cousin stated that their aunt Gail Coburn had a history of depression, once to the point of hospitalization, and that Petitioner's paternal grandmother also struggled with depression. Appl. for Evidentiary Hr'g, Ex. B at 2. Randy White stated that Petitioner's mother's family had a history of emotional and mental instability. Appl. for Evidentiary Hr'g, Ex. E at 4. Defense counsel could have reasonably concluded that pursuing that subject with those witnesses could cause more harm than good. First, neither Petitioner's cousin nor Randy White had any personal knowledge of Petitioner's family history with mental illness, meaning their testimony would rest on hearsay and speculation. Introducing that information through a mental health expert would be a cleaner avenue. Second, Gail Coburn testified at length for the defense and her testimony painted a very sympathetic picture of Petitioner's life. Trial Tr. vol. VIII, 2063-74. It is conceivable that counsel decided to shield Ms. Coburn from impeachment based on her mental health issues.

The lack of detailed testimony regarding Petitioner's mother's rage issues also fails to show deficient performance. As an initial matter, the report of Chris Lansdale's interview and accompanying investigator affidavit, which was submitted on direct appeal, is unquestionably inadmissible hearsay. This Court may therefore disregard the information contained in that affidavit. *See Neill v. Gibson*, 278 F.3d 1044, 1056 (10th Cir. 2001) (courts have the discretion not to consider investigator affidavits regarding discussions

with jurors). Still, even considering that report, counsel's performance was not deficient in how they chose to address that issue.

Lansdale testified at trial that he once heard Connie Underwood shouting angrily, and that Petitioner told him to stay in Petitioner's bedroom until the incident passed. Trial Tr. vol. VIII, 1977. On cross-examination, the prosecution asked Lansdale if that was the only incident he had encountered, and Lansdale responded, "That's the only instance I can say I was there for. I'd heard of other instances that Randy and Dave had seen things like that. That's the only one I can personally say I was there for." *Id*. at 1992. As Petitioner points out, this is a flat contradiction of the investigator's report of his interview with Lansdale, which relates an incident where Connie Underwood broke an oak table in a fit of rage. Appl. for Evidentiary Hr'g, Ex. C-1. It is unlikely that Lansdale would forget that incident on the stand. It is instead reasonable to assume from his explicit testimony that Lansdale was not present for that incident. Defense counsel might have reasonably arrived at the same conclusion, and decided not to pursue that line of questioning with Lansdale based on his limited personal knowledge.

Defense counsel also reasonably opted not to call Randy White. Defense counsel told the jury that they had decided not to call two other witnesses, because their testimony would be cumulative. Trial Tr. vol. X, 2536. Defense counsel's decision was a strategic one, and certainly reasonable. White's testimony may have added some information regarding Connie Underwood's temper, but also carried a great impeachment risk. Lansdale identified White as one of the bullies that tormented Petitioner. Appl. for

Evidentiary Hr'g, Ex. C-1. Also, White had just been released from prison, where he served time for forgery. Appl. for Evidentiary Hr'g, Ex. E at 1. White's testimony would have been largely cumulative, and would have given the prosecutors ample fodder for impeachment. Defense counsel could have reasonably decided that the best way to present Connie Underwood's rage issues was through their experts. While the prosecution tried to exploit the supposed disconnect between the expert and lay testimony, this Court cannot say that defense counsel performed deficiently by deciding that the evidence would be better conveyed by the experts, rather than by lay witnesses who would face withering cross-examination.

Counsel also could have reasonably decided to avoid evidence of Petitioner's behavior when on his medications. David McDade found Petitioner more "normal" when on his medications, while Lansdale said that Petitioner was more relaxed and social when not on medications. Appl. for Evidentiary Hr'g, Exs. C-1, D. This contradicting testimony would have been unhelpful, especially since one of Petitioner's experts attributed Petitioner's changes in mood and behavior to his bipolarity and hypomania, not his medications. Trial Tr. vol. IX, 2179-81. Defense counsel's focus on Petitioner's mental illness, rather than contradictory evidence of his behavior while on medication was reasonable. Based on the above discussion, it is clear that defense counsel performed reasonably under the prevailing professional norms in presenting the mitigation evidence.

Even if Petitioner could establish that defense counsel's performance was deficient, he cannot show prejudice. Petitioner argues primarily that the omission of the details

mentioned above undercut the expert's testimony and made it appear that the experts were relying on exaggerated or inaccurate information. Petition at 9-10. Petitioner also claims that the additional information would support the mitigating factors that the defense offered. *Id.* Neither argument is persuasive.

First, nothing in the record indicates that the jury doubted Petitioner's experts' diagnoses and testimony. All three experts testified that Petitioner would not pose a continuing threat to society. Trial Tr. vol. IX, 2184-85, 2265-66, 2346. In spite of evidence in the record supporting a finding of a continuing threat, the jury rejected that aggravating circumstance. O.R. 8 at 1508. The jury apparently credited the expert testimony. As Petitioner can only speculate to the contrary, this Court cannot fault the OCCA for rejecting that speculation.

Second, the omitted evidence would have had very little impact on the trial, especially in light of the evidence that did populate the record. This additional information may have shown that Petitioner's mother was somewhat more prone to rage than witnesses said. His father was perhaps a bit harsher on him than the jury heard. Petitioner was more isolated and anxious than the record reflected. Courts do not award habeas relief based on a showing that defense counsel could have presented a little more to the jury. Instead, courts typically find prejudice when counsel completely omits any evidence of sexual abuse, physical abuse, mental illness, and the like. *See Rompilla v. Beard*, 545 U.S. 374, 390-93 (2005); *Williams v. Taylor*, 529 U.S. 362, 396-97 (2000); *Wilson v. Sirmons*, 536 F.3d 1064, 1093-95 (10th Cir. 2008). The OCCA was not unreasonable in

determining that counsel's failure to add more detail to an already comprehensive mitigation case prejudiced the defense. Relief is denied on this issue.

### 3. Failure to Employ and Properly Utilize Expert Services.

Petitioner also claims that although defense counsel called upon three experts to examine him and testify about his mental health, defense counsel did not investigate whether Petitioner suffered from a developmental disorder. Petition at 12. Petitioner claims that defense counsel knew of his clear markers for a developmental disorder, but chose to present evidence of Schizotypal Personality Disorder ("SPD"). *Id*. 12 & n.8. A different expert, Dr. Gary Jones, later diagnosed Petitioner with Asperger's Disorder ("Asperger's"), a diagnosis that Petitioner believes defense counsel should have discovered and presented at trial. *Id*. at 11-12; App. to Appl. for Post-Conviction Relief, *Underwood v. State*, No. PCD-2008-604, Ex. 3. Petitioner raised this issue in his application for post-conviction relief. *Underwood v. State*, PCD-2008-604, slip-op. at 3-4. The OCCA found that Petitioner did not suffer prejudice from counsel presenting his SPD diagnosis rather than an Asperger's diagnosis, and denied the claim. *Id*. at 4-5.

The thrust of Petitioner's argument is that Asperger's is a brain condition and developmental disorder as opposed to a personality disorder, like SPD, and therefore holds more mitigating weight with jurors. Petition at 12 n.8, 14. Petitioner's arguments are unpersuasive for several reasons.

First, the similarities between Asperger's symptoms and SPD symptoms make it improbable that the jury would be swayed just by switching the label. Petitioner argues that Asperger's is characterized by "obsessive preoccupations, emotional immaturity, lack of empathy, poor social judgment, and poor impulse control." *Id*. at 13. At trial, the jury heard that SPD is characterized by odd or eccentric thinking, tendency to think about one's self rather than others, poor social skills, and inability to pick up on social cues. Trial Tr. vol. IX, 2181, 2253. The significant overlap shows that the jury would have heard largely the same information, but with a different diagnosis. In fact, two of the defense experts actually mentioned that Asperger's and SPD were similar, and one even testified that although he did not specifically diagnose him with the disease, he actually thought Petitioner may have Asperger's. *Id*. at 2181, 2287. The jury therefore heard that the disorders were very similar and that one expert actually thought Petitioner might have Asperger's. It is unlikely going one step further and diagnosing Petitioner with Asperger's would alter any juror's perspective.

Second, Petitioner's insistence that the jury would have responded more favorably to Asperger's because it is an "organic brain condition" and a developmental disorder is unfounded. The assertion that Asperger's is an "organic brain condition" is unsupported by the record that the OCCA considered.[6] Also, the trial experts referred to SPD as a "developmental disorder," a "neurodevelopmental disorder," and a "brain condition." *Id*. at 2181, 2252-54. While Petitioner argues that these statements by the experts were inaccurate and confusing, the jury heard evidence that Petitioner had a

---

[6] This Court will not consider Ex. 16-17 for the same reasons stated in Footnote 4, *supra* p. 10.

neurodevelopmental disorder or brain condition that produced nearly the same symptoms as Asperger's.  Presenting a different developmental disorder and brain condition would likely have failed to change a juror's mind.

Third, while the Asperger's diagnosis could not have improved the defense's position regarding the continuing threat aggravator—the jury rejected that aggravator—it could have undercut the defense on that point.  Dr. Jones detailed Petitioner's lack of remorse and empathy for his young victim.  App. to Appl. for Post-Conviction Relief,  Ex. 3 at 8. It is apparent to this Court that rather than persuading jurors to spare him, Petitioner's robotic ruthlessness to an innocent child could have precipitated a finding that he posed a continuing threat.

Finally, the overwhelming weight of the evidence supporting the especially heinous, cruel, and atrocious aggravator makes it highly unlikely that substituting Asperger's for SPD would have changed the trial's outcome.  This Court agrees with the logic of the Seventh Circuit:

> [T]his was no crime of anger, no quick burst of uncontrollable rage immediately regretted.  The lead-up was cold and calculated, at points terrifyingly clinical.  [This Court] cannot fathom what could cause one to desire to [murder and violate this] child.  Perhaps that is what we simply call "evil."  But [this Court is] certain counsel's failure to throw in a few more tidbits from the past or one more diagnosis of mental illness onto the scale would not have tipped it in [Petitioner's] favor."

*Eddmonds v. Peters*, 93 F.3d 1307, 1322 (7th Cir. 1996).

The OCCA reasonably found that evidence Petitioner suffered from Asperger's would not have altered the outcome of his trial. For the same reason, Petitioner also cannot show any prejudice from appellate counsel's failure to raise that issue on direct appeal. Regarding appellate counsel ineffectiveness claims, the question is whether, absent the appellate counsel's deficient performance, there is a reasonable probability that the petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). There is no reasonable probability that Petitioner would have prevailed in his appeal by raising a claim that the OCCA denied as meritless in the post-conviction proceeding.[7]

### 4. Failure to Make Contemporaneous Objections.

The prosecution introduced many photographs and items into evidence in the guilt stage. While defense counsel objected to many items and photographs, counsel did not object to the introduction of a bowl, meat tenderizer, skewers, handcuffs, a plastic Barbie doll head, the narration of a dissection video, and a blood-soaked towel. Petition at 17-18. Defense counsel made a blanket objection to incorporating all the guilt stage evidence into the penalty stage, but did not specify to which exhibits they objected. *Id*. at 18. Petitioner claims that counsel's failure to properly object allowed the jury to consider highly irrelevant and prejudicial evidence. Petitioner raised this claim on direct appeal.

---

[7] Petitioner did raise appellate counsel ineffectiveness regarding this issue in his post-conviction application. It is unclear from the OCCA's post-conviction order whether the state court specifically considered this claim on its merits, because the order focused on whether *trial* counsel was ineffective. *Underwood*, No. PCD-2008-604, slip op. at 3-5. In any event, this Court finds that Petitioner fails to establish prejudice from appellate counsel's omissions regardless of whether the standard of review was *de novo* or high deference under the AEDPA.

*Underwood*, 252 P.3d at 250-51.  The OCCA found that any objections to the evidence would have been properly overruled, therefore Petitioner did not suffer any prejudice from defense counsel's failure to object.  *Id*.

As discussed further in Ground Seven, the OCCA reasonably found that this evidence was admissible under Oklahoma law.  *Infra* pp. 59-63.  These items went to Petitioner's intent and state of mind and to corroborate his detailed and damning confession.  While the evidence is certainly inflammatory, Petitioner's was the most inflammatory of crimes. In that context, the prejudicial nature of the evidence did not substantially outweigh its probative value.  Therefore, Petitioner cannot show prejudice from counsel's failure to object to admissible evidence.  *See Hale v. Gibson*, 227 F.3d 1298, 1321-22 (10th Cir. 2000) (no prejudice when trial counsel fails to object to admissible evidence); *see also Savage v. Bryant*, 636 F. App'x 437, 440-41 (10th Cir. 2015) (same); *Haney v. Addison*, 275 F. App'x 802, 806 (10th Cir. 2008) (same).  The OCCA reasonably concluded that counsel's failure to raise a meritless objection to admissible evidence did not prejudice the defense.  Relief is denied on this issue.

**5.**  Failure to Raise the Claim that the Eighth Amendment Prohibits the Execution of Mentally Ill Persons.

Petitioner claims that trial counsel was ineffective for not arguing at trial that Petitioner's death sentence would violate the Eighth Amendment because he was mentally ill.  Petition at 19.  Petitioner raised this claim on direct appeal.  The OCCA rejected the claim, holding that any such challenge would have been properly overruled, and therefore Petitioner could not show prejudice.  *Underwood*, 252 P.3d at 250-51.

As discussed further in connection with Ground Ten, the Supreme Court has never prohibited the execution of persons who are mentally ill, but not mentally retarded. *Infra* pp. 70-72. Therefore, any claim advancing that theory is meritless. Although counsel may advocate for expanding the meaning of our "evolving standards of decency," this Court cannot find prejudice where counsel opts not to tilt at that particular windmill. *See Dennis v. Poppel*, 222 F.3d 1245, 1261 (10th Cir. 2000). The OCCA's decision was not unreasonable, and relief is denied on that point.

**6.** Failure to Raise the Gag Order Violation on Appeal.

Petitioner complains that appellate counsel failed to raise two issues on direct appeal related to pretrial publicity. Early in Petitioner's criminal proceedings, the trial court signed an agreed order that the parties would refrain from making extrajudicial statements regarding the case. O.R. 1 at 33. Later, in response to concerns that the press was disseminating the filed pleadings in the case to the public, the trial court ordered that any filing containing sensational material or that could "lend itself to sensational type of headlines" would be filed under seal. In Camera Hr'g Tr. 12-13, Aug. 30, 2007. In spite of that order, the State publicly filed a "Second Supplemental Notice of Intent to Offer Victim Impact Evidence," which contained Curtis Bolin's proposed victim impact testimony about Miss Bolin. O.R. 5 at 988-90. Also, some of the trial court's ruling on Petitioner's motion to suppress was leaked to the media, although the ruling itself was filed under seal. O.R. 7 at 1212-19; Hr'g Tr. 2-3, Feb. 13, 2008. Trial counsel moved to strike the Bill of Particulars based partially on these issues. O.R. 7 at 1238, 1272, 1327-

30.  The trial court did not strike the Bill.  O.R. 8 at 1435.  Appellate counsel did not raise this issue on direct appeal.  Petition at 20-21.

In his post-conviction proceeding, Petitioner claimed that appellate counsel was ineffective for not raising the leak of the suppression order on direct appeal.  *Underwood*, PCD-2008-604, slip op. at 5.  The OCCA denied the claim because there was no evidence of how the leak occurred, and Petitioner offered no explanation for how the leak affected his ability to receive a fair trial.  *Id*. at 5-6.   Petitioner never challenged the trial court's handling of the victim impact notice in either on direct appeal or in post-conviction proceedings.

A petitioner can show deficient performance based on appellate counsel's failure to raise certain claims on appeal when "the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal." *Upchurch v. Bruce*, 333 F.3d 1158, 1163 (10th Cir. 2003) (quoting *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003)).   If appellate counsel fails to raise a claim that has some merit, but is not compelling, courts must view the issue in light of the rest of the appeal, and give deference to counsel's professional judgment.  *Id*. at 1163-64.  There is no deficient performance for omitting meritless claims.  *Id*. at 1164.

Appellate counsel cannot be faulted for not challenging the victim impact notice issue on appeal.[8]   The trial court's gag order related to "sensational" material, but the victim

---

[8] Rather than address the exhaustion and procedural bar issues that may apply to the victim impact notice issue, this Court can resolve the issue on the merits.  *Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir. 2000).  Since the state courts never addressed this specific claim, this

impact notice only included information about Curtis Bolin's grief and his relationship with the victim. O.R. 5 at 988-90. While certainly emotional, that information is not the type of "sensational" information the trial court sought to restrict. Instead, the trial court intended to avoid publicity about the lurid details of the crime. The victim impact testimony did not relay any such information, and was not the type of information that would undermine Petitioner's right to a fair jury. Petitioner cannot show that appellate counsel's failure to raise that losing proposition prejudiced his appeal.

Petitioner's claim likewise fails regarding the leaked information. Petitioner claims that the leaked evidence was "highly inflammatory" because it contained "vivid details." Petition at 21. But the pertinent facts contained in the media report at issue were that Petitioner's incriminating statements could be admitted into evidence, that Petitioner was charged with Miss Bolin's murder as part of a cannibalistic plot, and that the search that uncovered Miss Bolin's body was legal. Hr'g Tr. 13-14, Feb. 13, 2007. The only "inflammatory" or "vivid" facts were the reference to the cannibalistic plot. But that information was already in the public realm through the State's More Definite and Certain Statement Regarding Bill of Particulars, which preceded the gag order. O.R. 4 at 612-16. Reporting on a legal ruling, while certainly concerning when that ruling was filed under seal, did not give appellate counsel a meritorious issue that would be unreasonable to omit. The OCCA's denial was not unreasonable.

### 7. Failure to Rebut Dr. Meloy's Testimony.

_____

Court addresses the issue *de novo*. *McCracken v. Gibson*, 268 F.3d 970, 975 (10th Cir. 2001).

Petitioner claims that trial counsel failed to rebut Dr. Meloy's testimony that neuroimaging testing was necessary to confirm Petitioner's diagnoses. Petition at 21. Petitioner also claims that trial counsel did not challenge Dr. Meloy's claim that trial counsel knew the testing was necessary, even though Dr. Meloy agreed in his report that there was no need for such testing. *Id*. at 21-22. Petitioner says that this testimony allowed the prosecution to argue in closing that the testing was omitted on purpose to protect a suspect diagnosis. *Id*. at 21-23. Petitioner raised the claim on direct appeal. *Underwood*, 252 P.3d at 253-54. The OCCA denied the claim, finding that Dr. Meloy's testimony did not affect the outcome of the trial because Dr. Meloy did not disagree with Petitioner's diagnoses. *Id*. at 254.[9] Also, although Dr. Meloy testified in support of the continuing threat aggravator, the jury actually rejected that aggravator. *Id*.

Petitioner fails to show that the OCCA's ruling was unreasonable. Trial counsel established through testimony that Dr. Meloy was not a psychiatrist or a neuropsychologist. Trial Tr. vol. X, 2458. Dr. Meloy admitted that he would defer to the other experts' diagnoses. *Id*. at 2471-72. The main disagreement between Dr. Meloy and Petitioner's experts was whether Petitioner presented a continuing threat to society. And even though the prosecution certainly argued that Dr. Meloy's testimony cast doubt on the diagnoses, the jury's rejection of the continuing threat aggravator indicates that they were not moved by Dr. Meloy's testimony or the prosecutor's argument. Fair-minded

---

[9] To the extent that Petitioner is challenging the OCCA's fact-finding by arguing that Dr. Meloy said that neuroimaging was "necessary" to confirm Petitioner's diagnoses, Petitioner fails to rebut the OCCA's findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The testimony at issue does not state or even imply that such testing is necessary to confirm the diagnoses, only that it *could* have confirmed the diagnoses. Trial Tr. vol. X, 2482.

jurists would not likely agree that there is a reasonable probability that the failure to rebut Dr. Meloy's testimony prejudiced the defense.[10]  Relief is denied on that issue.

**8.**  Failure to Rebut Assistant Medical Examiner's Testimony.

Petitioner claims that trial counsel was ineffective for not offering a forensic pathologist to rebut assistant medical examiner Dr. Yacoub's testimony regarding the victim's autopsy.  Petition at 23-24.  Trial counsel had retained a forensic pathologist, Dr. Adams, to review Dr. Yacoub's work, but never called him as a witness.  *Id*. at 24. Petitioner complains that Dr. Adams could have rebutted key parts of Dr. Yacoub's testimony, including insinuations that Miss Bolin was alive while Petitioner partially decapitated and sexually assaulted her.  *Id*.  Petitioner raised trial counsel's failure to call Dr. Adams as an issue on direct appeal.  *Underwood*, 252 P.3d at 251.  The OCCA found that there were sound strategic reasons for trial counsel's decision not to call Dr. Adams, and that the decision did not prejudice the defense.  *Id*. at 253.

During the guilt stage, Dr. Yacoub testified that Miss Bolin died of asphyxiation. Trial Tr. vol. VII, 1801.  In the course of Dr. Yacoub's testimony, she gave details about the cut on Miss Bolin's neck, the air embolism in her brain, and the bruising of her genital area.  *Id*. at 1769-78, 1786-91.  Dr. Yacoub testified that the presence of food in Miss Bolin's airway indicated that she lacked the reflex to cough and remove food from

---

[10] Petitioner takes issue with the OCCA's determination that there was not a "strong" possibility that the testimony affected the outcome of the trial, and argues that this formulation does not meet the rigorous standards of *Strickland*.  Petition at 22 n.17.  *Lott v. Trammell* clearly states that the OCCA's standard is actually less deferential than *Strickland*, and therefore a ruling under the OCCA's standard necessarily operates as an adjudication on the merits of a *Strickland*-based claim.  705 F.3d 1167, 1213 (10th Cir. 2013).

the airway.  *Id*. at 1773.  Dr. Yacoub agreed it was likely that Miss Bolin was unconscious, that food came up into her airway, and she was unable to cough to clear her throat.  *Id*. at 1773-74.  Dr. Yacoub also testified that the air embolism in the brain could have occurred by introducing air into the blood vessels either pre-or postmortem.  *Id*. at 1777.

Dr. Yacoub discussed tears on the outside of Miss Bolin's vagina, and a red mark inside her cervix.  *Id*. at 1787.  Dr. Yacoub testified that she could not tell if the mark inside the cervix was a contusion or just postmortem lividity.  *Id*.  Dr. Yacoub opined that since the outside marks were red instead of pale, the injuries were possibly inflicted while Miss Bolin was alive, dying, or immediately after she died.  *Id*. at 1791.  If the inside mark was a contusion, Dr. Yacoub said the same conclusion applied.  *Id*.

On cross examination, Dr. Yacoub admitted that the fracture of Miss Bolin's hypoid bone, located in the upper part of the neck, was probably inflicted postmortem.  *Id*. at 1806-08.  Dr. Yacoub also admitted that Miss Bolin could have been deceased when Petitioner cut her throat.  *Id*. at 1811-12.  Dr. Yacoub agreed that she could not scientifically tell when Miss Bolin became unconscious.  *Id*. at 1818-19.

Defense counsel accomplished a great deal on cross examination.  While Dr. Yacoub certainly introduced the possibility that Miss Bolin was alive while Petitioner cut her throat and sexually assaulted her, that possibility was qualified as just one of several other scenarios.  Yacoub freely admitted on cross-examination that it was possible Miss Bolin was deceased when those events occurred.  And defense counsel elicited Yacoub's

admission that she could not say with any certainty that Miss Bolin was conscious at that time. Defense counsel emphasized that Miss Bolin was at least not conscious, and possibly dead. At most, Dr. Adams would have added that she was definitely deceased. But a critical question for the jury in deciding whether the murder was especially heinous, atrocious, or cruel was whether Miss Bolin was conscious or unconscious, not whether she was deceased. Counsel ably addressed that issue through cross-examination, and Dr. Adam's further testimony would not have yielded a significant strategic benefit.

Dr. Adams' testimony could, however, present a problem for Petitioner's case. One of Petitioner's mitigating circumstances stated that he was cooperative with the police and confessed to the murder. O.R. 8 at 1492. Part of that confession was that he did not penetrate Miss Bolin postmortem, but only rubbed the tip of his penis on her vagina. State's Ex. 162 at 68. But Dr. Adams' report unequivocally shows that some object did penetrate Miss Bolin's vagina, causing tearing of the hymen. Appl. for Evidentiary Hr'g, Ex. A at 6. Trial counsel likely would not want to confirm for the jury that Petitioner concealed the extent to which he sexually assaulted his victim. Counsel could have reasonably assumed that regardless of whether Miss Bolin was alive or dead, the jury would not only find that Dr. Adams' testimony undermined the mitigating circumstances, but confirmed that Petitioner's actions were more abominable than even his gruesome confession revealed. The OCCA found that counsel acted reasonably when faced with the marginal benefit and the possible detriment of presenting Dr. Adams. This Court cannot find that determination unreasonable.

### 9. Conclusion.

The OCCA found that the challenged actions of trial and appellate counsel were either reasonable, or that the actions did not prejudice the defense. After a careful review of the materials and record that the OCCA considered, this Court concludes that the OCCA's determinations are not contrary to, or unreasonable applications of, existing federal law. Relief is denied as to Ground One.

### B. Ground Two: Trial Court's Failure to Dismiss Three Jurors for Cause.

The trial court conducted individual *voir dire* on the issue of the death penalty and pretrial publicity and then conducted general *voir dire*. Trial Tr. vol. I, 54-vol. V, 1246. Petitioner challenged three prospective jurors for cause, but the trial court allowed those three to stay on the jury panel. Petition at 27. Petitioner then used three of his nine peremptory challenges to remove those jurors. *Id*. As a result, Petitioner claims that three other objectionable jurors remained on the panel, making his jury not impartial. *Id*. at 27, 39. The OCCA denied this claim on direct appeal. *Underwood*, 252 P.3d at 240-42. The OCCA held that the trial court did not abuse its discretion in not excusing the three jurors for cause, and found that Petitioner's use of peremptory challenges to remove those jurors did not violate any constitutional or statutory right. *Id*. at 241-42.[11]

---

[11] Petitioner complains that the OCCA cited *Wainwright v. Witt* but did not quote the standard. Petition at 29. The OCCA cited *Witt* as the basis for its opinion. *Underwood*, 252 P.3d at 240. And while the OCCA focused on whether the jurors could consider all punishments, that question is certainly pertinent to whether the jurors' views on the death penalty would prevent or substantially impair their performance as jurors. The OCCA's emphasis on the relevant inquiry does not mean that the OCCA did not apply the broad constitutional standard. A juror who can give fair consideration to all three possible punishments is necessarily one who is not prevented or substantially impaired from performing their duties by their view of the death penalty.

### 1. *Clearly Established Law.*

The right to a jury trial requires that criminal defendants be tried by a panel of impartial jurors. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Jurors need not be totally ignorant of the facts and issues involved, but must be able to "lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court." *Id*. at 722-23. The trial court determines juror impartiality, and those determinations are findings of fact. *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). The trial court evaluates prospective jurors' demeanor and credibility, which are important considerations apart from the cold record of questions and answers. *See Uttecht v. Brown*, 551 U.S. 1, 7-8 (2007). When faced with ambiguity in a prospective juror's statements, the trial court is free to resolve that ambiguity in favor of the State. *Id*. at 7. Reviewing courts therefore owe deference to a trial court's decision to excuse or not excuse a juror for cause. *Id*. This deference is added to the already "independent, high standard" for habeas review under the AEDPA. *Eizember v. Trammell*, 803 F.3d 1129, 1135-36 (10th Cir. 2015).

Due process requires an impartial jury, but does not mandate specific methods to achieve one. *Brown v. New Jersey*, 175 U.S. 172, 176 (1899). Due process does not protect the "meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial.'" *Rivera v. Illinois*, 556 U.S. 148, 157-58 (quoting *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967)). Because there is no free-standing right to peremptory challenges, those challenges only raise due process concerns

if a defendant receives fewer than state law affords, or if jurors on the panel would be removable for cause, creating a non-impartial jury. *United States v. Martinez-Salazar*, 528 U.S. 304, 316-17 (2000).

### 2. Analysis.

In spite of Petitioner's in-depth discussion of jurors Sanderson, Bettes, and Thompson, this Court need not decide whether they should or should not have been excluded for cause, as they ultimately did not sit on the jury panel. *See Ross v. Oklahoma*, 487 U.S. 81, 86 (1988). Instead, this Court must determine whether Petitioner received the number of peremptory challenges provided for by Oklahoma law, and whether the jury that actually decided Petitioner's case was impartial.

Oklahoma law provides parties nine peremptory challenges each in first degree murder cases. OKLA. STAT. tit. 22, § 655. Petitioner received and used nine peremptory challenges. Trial Tr. vol. V, 1258-1260. Petitioner argues, based on OCCA precedent, that he was entitled to more peremptory challenges because he had to use three challenges on Jurors Sanderson, Bettes, and Thompson, forcing him to keep three other "unacceptable jurors." Petition at 41. But supposed "errors of state law do not automatically become violations of due process," and it is the State's prerogative to determine whether jury composition is proper under state law. *Rivera*, 556 U.S. at 160-61. In this case, the OCCA found that Petitioner's use of peremptory challenges to remove jurors Sanderson, Bettes, and Thompson "did not violate any constitutional or

statutory rights."[12]  *Underwood*, 252 P.3d at 242.  It is the OCCA's prerogative to rule on that underlying state law issue.  Any good-faith error on the state courts' part "is not a matter of federal constitutional concern.  Rather, it is a matter for the State to address under its own laws."  *Rivera*, 556 U.S. at 157.

Petitioner argues that he does present a federal constitutional concern because the three "objectionable" and "unacceptable" jurors he could not remove undermined his jury's impartiality.  Petition at 27, 39-40.  But Petitioner fails to show that the jurors on his panel were not impartial.

Petitioner claims that Juror Baldwin "indicated" that he would automatically impose the death penalty when a law enforcement officer was killed.  *Id*. at 40.  The Court is unsure what Petitioner means by "indicated," as the record clearly shows that Baldwin only believed that the death penalty *could* be appropriate in that situation, and explicitly corrected defense counsel's suggestion that he favored an automatic death penalty for such an act.  Trial Tr. vol. I, 147-48.  Even accepting Petitioner's incorrect version of facts, the trial court could have reasonably found that Baldwin would still be impartial in Petitioner's case, as there was no law enforcement victim.

Petitioner's complaint about Juror Amber Garrett stems from her reliance on biblical principles for her decision-making.  Petition at 40.  Petitioner claims that Garrett's answer presented a danger that she would ignore the court's instructions and instead base her

---

[12] Petitioner claims that the OCCA did not reach his peremptory challenge argument on the merits, but this line from the OCCA's opinion clearly shows that the OCCA did briefly address that issue.

decision on "God's law." *Id*. This argument fails for two reasons. First, Garrett unequivocally stated multiple times that she could consider all three punishments and would follow the law. Trial Tr. vol. II, 294-95, 298-99, 305-06. Second, the answer that troubles Petitioner was given in response to a question of whether a sermon at church could sway her belief that the death penalty was a valid punishment. *Id*. at 300-301. Garrett responded that she was a Christian and lived by biblical principles, but she would not base her view of the death penalty solely on what a pastor said. *Id*. at 301. The question and answer were in the context of religious reservations about the death penalty, and how Garrett would personally reconcile her religious beliefs with her beliefs about the death penalty. The answer does not indicate that she would disregard the court's instructions based on her reading of the Bible.

Finally, Petitioner claims that Juror Williams would not give full consideration to all the sentencing options. Petition at 40. Petitioner bases that claim on two of Williams' answers, where he leaned towards always imposing the death penalty when the crime involved a defenseless victim. Trial Tr. vol. II, 438-39. But once the parties explained the process of a capital murder trial, including the concept of aggravating and mitigating circumstances, Williams affirmed that he could consider all of the punishments. *Id*. at 440-41, 443-45, 449-51. At worst, Williams' answers raised mere ambiguity, which the trial court could resolve in favor of the State. It is telling that the trial court never faced that dilemma because Petitioner never challenged Williams for cause.

Petitioner received the nine peremptory challenges that Oklahoma law provided, and fails to show that his jury was not impartial. Therefore, the OCCA's finding that the loss of peremptory challenges did not violate Petitioner's constitutional rights is not unreasonable. Relief is denied as to Ground Two.

## C. Ground Three: Juror Dishonesty.

Petitioner claims that he was denied an impartial jury because Juror Earl Garrett failed to disclose several encounters with the legal system. Petition at 43-45. Through the initial juror questionnaire and general *voir dire*, Garrett shared several of his experiences with the legal system, but did not reveal that he was once involved in a contentious civil suit that resulted in a bar complaint, charges against another party for harassing phone calls, and complaints that Garrett engaged in harassing behavior. *Id*. at 43-44. Garrett also failed to mention that his boat repair shop was twice burglarized and that his wife and daughter were victims of violent crimes. *Id*. at 44. Finally, Petitioner claims that Garret did not disclose a 1979 felony charge for receiving stolen property. *Id*.

Petitioner raised this issue in a motion for new trial before the OCCA, arguing that Garrett was dishonest in his answers, and that honest answers would have shown his implied bias against Petitioner. *Underwood*, 252 P.3d at 254; Petition at 45. The OCCA denied the motion, finding that Petitioner failed to show that Garrett would have been

removable for bias, therefore the omissions were not material to Petitioner's ability to receive a fair trial. *Id*. at 256-57.[13]

### 1. Clearly Established Law.

Voir dire is the mechanism for securing a jury "capable and willing to decide the case solely on the evidence before it." *Gonzales v. Thomas*, 99 F.3d 978, 983 (10th Cir. 1996) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). "The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984). A party can therefore obtain a new trial by showing that "a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id*. at 556. Only intentional falsehoods satisfy the first part of the test, as opposed to honest but mistaken responses. *Id*. at 555.

If a juror intentionally answers a *voir dire* question dishonestly, the challenging party must show that an honest response would support a valid challenge for cause. *Id*. at 556. One valid reason to challenge a juror is implied bias. *Gonzales*, 99 F.3d at 985-86. Whether a juror is impliedly biased is a legal determination "that turns on an objective evaluation of the challenged juror's experiences and their relation to the case being tried." *Id*. at 987. The implied bias doctrine is "reserved for those 'extreme and exceptional'

---

[13] Petitioner's claim that the OCCA did not apply federal law to this issue is unfounded. The OCCA not only cited *McDonough Power Equipment, Incorporated v. Greenwood*, 464 U.S. 548 (1984) but also decided the claim on whether Juror Garrett was removable for cause, which is the second prong of the *McDonough* test.

circumstances that 'leave serious question whether the trial court . . . subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice.'" *Id*. (quoting *Smith*, 455 U.S. at 222 & n* (O'Connor, J., concurring)).  While courts may consider the juror's dishonesty in determining bias, it is just one factor. *Id*. at 989.

Implied bias exists where a juror is employed by the prosecuting agency, is closely related to a participant of the trial or criminal transaction, or was a witness or otherwise involved in the criminal transaction. *Id*. at 987.  Similarities between the juror's experience and the facts giving rise to the trial also indicate implied bias. *Id*.  However, the similarities must be more than a superficial resemblance, and even a showing that the juror was the victim of the same crime for which the defendant is on trial is insufficient to establish implied bias. *See id*. at 989-90 (rape victim is not, as a matter of law, incapable of being impartial on a rape trial).

### 2. Analysis.

It is a close issue of whether Garrett intentionally failed to disclose the additional information.  But rather than grapple with that question, this Court can resolve this claim by concluding that the OCCA reasonably found that even if Garrett gave complete answers, there would be no grounds for removing him for implied bias.  Complete answers would have shown that Garrett was involved in a contentious civil case, that his

boat repair shop was burglarized twice, and that his wife and daughter were victims of violent crime.  Petition at 43-44.[14]  None of these facts show implied bias.

First, none of those answers connect Garrett to a party, the prosecuting agency, or the criminal transaction.  Second, there are no similarities between Garrett's experiences and Petitioner's crime.  The closest nexus is the fact that Garrett's wife and daughter were victims of violent crime.  But those incidents are too dissimilar to create the extreme and exceptional circumstances needed to invoke implied bias.  Garrett's wife was physically abused in 1997 and his stepdaughter experienced screaming threats and an attempt to run her off the road. Mot. for New Trial, *Underwood v. State*, No. D-2008-319, Exs. 17, 18.  The only similarity between those crimes and Petitioner's is the violence against females.  Those experiences do not establish implied bias.

Petitioner hangs his implied bias claim on two arguments: Garrett was dishonest, and Garrett had a colorful legal history that made him look bad.  Petition at 47.  Assuming that Garrett was actually dishonest, that fact alone is insufficient by itself to establish that Garrett was biased.  *See Skaggs v. Otis Elevator Co.*, 164 F.3d 511, 517 (10th Cir. 1998) (finding that a juror is impliedly biased just from a dishonest response would eradicate *McDonough's* second prong).  And Garrett's extensive experiences with the legal system do not automatically render him incapable of serving on a jury.  Neither argument

---

[14] Petitioner's claim that Garrett only disclosed a "misunderstanding" with his employer rather than a felony charge for receiving stolen property smacks of linguistic maneuvering.  Garrett indeed discussed the issue, and even revealed that he was arrested, but that the charges were later dropped.  Trial Tr. vol. V, 1192-93.  While Garrett may have never uttered the word "felony," he clearly did not conceal this encounter with the law.

persuades this Court that the OCCA's decision was unreasonable. Relief is denied as to Ground Three.

**D.  Ground Four:  Sentence Recommendations By Victim's Family.**

Miss Bolin's father and mother both gave victim impact testimony in the penalty stage and recommended a death sentence.  Trial Tr. vol. VIII, 1946-54.  Petitioner claims that the sentence recommendations violated the Eighth and Fourteenth Amendments.  Petition at 48.  The OCCA denied this claim on direct appeal, holding that the testimony was appropriate when limited to a simple, unamplified statement recommending punishment. *Underwood*, 252 P.3d at 248.

### 1.  Clearly Established Law.

The Supreme Court at one time prohibited testimony by a murder victim's family that "described the personal characteristics of the victims and the emotional impact of the crimes on the family," and gave "family members' opinions and characterizations of the crimes and the defendant." *Booth v. Maryland*, 482 U.S. 496, 502-03, 509 (1987).  The Supreme Court later reversed *Booth* in part, and found that the first category (characteristics of the victims and the impact on the family) was admissible. *Payne v. Tennessee*, 501 U.S. 808, 830 & n.2 (1991).  But *Payne* did not open the door for family members to give their opinions regarding the crimes and the defendant. *Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011).  Therefore, victim impact testimony that provides a punishment recommendation for a capital defendant violates the Eighth

Amendment. *Id*. at 1026-27. Since Respondent concedes the violation in this case, this Court need only determine if the violation was harmless.

### 2. Harmless Error.

When the state court did not address an error, this Court must determine if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116, 121-22 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This test lets habeas petitioners obtain plenary review, but only allows relief if the error caused "actual prejudice." *Brecht*, 507 U.S. at 637. But an "error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Id*. at 634. To grant relief, the reviewing court must have grave doubts as to the error's effect on the verdict, and if the court is in "virtual equipoise as to the harmlessness of the error," the court should "treat the error…as it affected the verdict." *Selsor*, 644 F.3d at 1027 (quoting *Fry*, 551 U.S. at 121 n.3).

The Tenth Circuit considers the (1) quantity and nature of the recommendations, (2) limiting instructions regarding victim impact testimony, (3) the surety of guilt, and (4) the overwhelming evidence in support of aggravating circumstances when weighing whether a sentence recommendation was harmless. *See Dodd v. Trammell*, 753 F.3d 971, 997-98 (2013); *Grant v. Trammell*, 727 F.3d 1006, 1016-17 (10th Cir. 2013); *Lockett v. Trammell*, 711 F.3d 1218, 1238-39 (10th Cir. 2013); *Lott*, 705 F.3d at 1219; *Selsor*, 644 F.3d at 1027; *Welch v. Workman*, 639 F.3d 980, 1003-04 (10th Cir. 2011).

The Tenth Circuit has only reversed one death sentence due to sentence recommendations by family members. In *Dodd*, the Tenth Circuit found itself in "grave doubt about the effect of the error on the jury's sentencing decision" for several reasons. 753 F.3d at 999 (quoting *Lockett*, 711 F.3d at 1232). First, six or seven of the prosecution's eight penalty phase witnesses recommended death, creating a "drumbeat" in support of the death penalty. *Id.* at 997. Second, the jury did not find either the heinous, atrocious, or cruel aggravator or the continuing threat aggravator. *Id.* at 998. The aggravators the jury did find added "little beyond the findings of guilt." *Id.* Finally, the defendant's guilt was not clear cut, and the case was circumstantial. *Id.* Those factors led the Tenth Circuit to find that the error was not harmless. *Id.* at 999.

### 3. Analysis.

This case is no *Dodd*. The factors that the Tenth Circuit has identified weigh in favor of harmless error here. First, the sentence recommendations were minimal and non-inflammatory. Miss Bolin's father merely referenced the death penalty when asked if he had a punishment recommendation. Trial Tr. vol. VIII, 1954. Her mother only said "the death penalty. I don't have my little girl." *Id.* at 1950. These recommendations were brief and mild compared to the drumbeat in *Dodd*. Second, the judge instructed the jury regarding the weight and use of victim impact testimony. O.R. 8 at 1499. Third, guilt in this case was so clear that the defense informed the trial court that they would not seriously contest guilt. Trial Tr. vol. I, 48-53. Unlike the circumstantial case in *Dodd*, the jury heard Petitioner's graphic confession to the crime at issue.

Fourth, the prosecution presented overwhelming evidence supporting the especially heinous, atrocious or cruel aggravator. The jury heard that Petitioner violently beat the minor victim with a cutting board as she screamed for him to stop. State's Ex. 162 at 61. He tried to smother her with his bare hands, avoiding quick strangulation to keep her body "perfect." *Id*. at 62. He struggled to kill her for fifteen to twenty minutes as she fought desperately to escape and he became sexually aroused in the process. *Id*. at 63-64.

Petitioner attempts to counter this damning evidence by pointing out that the jury rejected the continuing threat aggravator. But as *Dodd* recognized, the especially heinous, atrocious, or cruel aggravator is a vital one, so much so that the Tenth Circuit has found a sentence recommendation harmless although the jury only found that single aggravator. *See Willingham v. Mullin*, 296 F.3d 917, 931(10th Cir. 2002). And not only is that vital aggravator well-supported by the evidence, the jury also heard significant evidence to support the prosecution's theory that Petitioner posed a continuing threat. While the jury ultimately rejected the continuing threat aggravator, the evidence certainly weighed in favor of the death penalty and therefore is relevant to this Court's harmless error analysis.[15] *See Selsor*, 644 F.3d at 1027.

Petitioner's further arguments about jury holdouts, the time of deliberation, and the jury's note are immaterial. Even if this Court were inclined to credit the hearsay testimony regarding what happened in the deliberations, there is no evidence that the

---

[15] Petitioner also makes the curious assertion that the jury's decision indicates that he is not "the worst of the worst." However, it seems a meritless argument that no matter how depraved, no matter how cruel, no matter how ruthless a murder might be, the murderer is only the "worst of the worst" if there is a danger he would do the same again.

recommendations played any significant role in the jury's decision. The length of deliberation likewise provides no insight into the recommendations' effects. The jury sorted through significant evidence, including substantial expert testimony regarding the continuing threat aggravator. This Court cannot divine what caused the lengthy deliberation, and will not find fatal error based on speculation. And the note does not suggest prejudice, as "the jury was left with the same choices with which it began—death, life without parole, or life." *See Welch*, 639 F.3d at 1003.

The brief and unadorned nature of the victim testimony, the trial court's limiting instruction, and overwhelming evidence for both guilt and the especially heinous, atrocious, or cruel aggravator all assure this Court that the punishment recommendations did not have a substantial and injurious effect on the jury's determination of Petitioner's death sentence. Relief is denied as to Ground Four.

### E. Ground Five: Prosecutorial Misconduct.

Petitioner claims that the prosecutors violated his Fifth Amendment rights by (1) giving misguided explanations of the law; (2) undermining the presumption of innocence; (3) arguing facts not in evidence; (4) engaging in convincing theatrics; (5) manipulating a jury instruction; (6) impugning the defense experts' diagnoses; (7) misrepresenting evidence; (8) advocating for juror sympathy; and (9) giving their personal opinions on the appropriate punishment. Petition at 54-67. Petitioner raised prosecutorial misconduct claims on direct appeal regarding the presumption of innocence, arguing facts not in evidence, engaging in theatrics, and giving personal opinions about punishment.

*Underwood*, 252 P.3d at 249-50.  The OCCA did not find those actions improper and denied relief.  *Id.*

Petitioner also argued on appeal that the prosecution manipulated the jury instruction defining mitigating circumstances.  *Id.* at 244-45.  But that argument arose in context of Petitioner's claim that the jury instruction itself was infirm.  *Id.*  Petitioner did not raise the issue as a separate misconduct claim.  The OCCA upheld the instruction as proper. *Id.* at 245.  As a factor in that decision, the OCCA noted that the prosecutor's arguments did not encourage the jury to ignore mitigating circumstances.  *Id.*  The factual bases for the remaining claims appear in various places in the state court record, but Petitioner did not raise them as prosecutorial misconduct claims until this proceeding.

### 1.  Unexhausted Claims.

Before bringing a habeas action, petitioners must generally first exhaust their claims by "fairly presenting" them in state court.  *Picard v. Connor*, 404 U.S. 270, 275 (1971); 28 U.S.C. § 2254(b)(1)(A).  A petitioner need not provide "book and verse on the federal constitution," but they must go beyond simply presenting the facts supporting the federal claim or articulating a "somewhat similar state-law claim."  *Bland v. Sirmons*,  459 F.3d 999, 1011 (10th Cir. 2006) (quoting *Picard*, 404 U.S. at 278, and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).  Instead, the petitioner must have raised the substance of the federal claim in state court.  *Id.*

Two cases from the Tenth Circuit illustrate the scope of fair presentation. In *Hawkins v. Mullin*, 291 F.3d 658, 668 (10th Cir. 2002), the petitioner prohibited his trial counsel from presenting mitigating evidence. In his state court appeal, the petitioner attacked the trial court for respecting his wishes and barring trial counsel from presenting mitigating evidence. *Id*. at 668-69. The only ineffectiveness claim that the petitioner raised on appeal dealt with trial counsel's failure to challenge the trial court's jurisdiction. *Id*. at 669. In his habeas petition, petitioner raised a new ineffective assistance of counsel claim, arguing that trial counsel was ineffective for not investigating and presenting mitigating evidence. *Id*.

The Tenth Circuit found that the petitioner did not exhaust his ineffective assistance of counsel claim regarding the presentation of mitigating evidence, because while he challenged the trial court's actions in state court, his habeas claim targeted his counsel's actions. *Id*. The Tenth Circuit also found that the petitioner's presentation of other ineffectiveness claims on direct appeal did not exhaust his "significantly different federal habeas claim . . . ." *Id*.

In *Bland v. Sirmons*, 459 F.3d 999, 1011-12 (10th Cir. 2006), the petitioner presented a prosecutorial misconduct claim in state court based on the prosecutor's mischaracterization of a jury instruction, while conceding that the instruction itself was proper. Yet in his habeas petition, the petitioner challenged the instruction instead. *Id*. The petitioner argued that he exhausted the instruction claim because the state appeals court examined and approved the jury instructions. *Id*. at 1012. But the Tenth Circuit

held that the state court's finding on that point dealt with whether the prosecutor's comments caused the jury to disregard the trial court's instructions. *Id*. at 1012. The Tenth Circuit found that a "challenge to the actions of the prosecution differs significantly from a challenge to the instructions given by the court," and the "somewhat similar" claim was not fairly presented to the state court. *Id*. These cases are instructive in considering Petition's claims here.

i. *Issue A: Prosecutors gave misguided explanations of law.*

First, Petitioner claims that prosecutors misguided the jury on what "full consideration" of punishments meant. Petition at 55-56. The prosecutor explained that full consideration meant more than the type of cursory consideration a person that hates Brussels sprouts would give that vegetable in a buffet line. Trial Tr. vol. I, 60. The prosecutor said that while the person might have technically "considered" the Brussels sprouts, they decided not to pick them. *Id*.

The only time that Petitioner mentioned Brussels sprouts on direct appeal was within his juror claim. Br. of Appellant, 50, *Underwood v. State*, No. D-2008-319. Petitioner did not challenge the analogy, but only complained that Juror Sanderson's answer, which referred to the analogy, did not indicate that she would give fair consideration to all punishment options. *Id*. Petitioner did not fairly present a prosecutorial misconduct claim based on the analogy.

ii. *Issue E: Prosecutors manipulated a jury instruction.*

Petitioner claims that prosecutors manipulated the jury instruction defining mitigating circumstances. Petition at 60. In state court, Petitioner claimed that the jury instruction itself was infirm. Br. of Appellant at 64. Within that claim, Petitioner argued that the prosecution exploited the instruction to denigrate the mitigating evidence. *Id*. at 65-67, 69-70. Petitioner never raised a prosecutorial misconduct claim on that issue, although he appealed on other misconduct claims.

Two principles from *Bland* and *Hawkins* convince this Court that Petitioner did not fairly present this claim to the OCCA. First, just as in *Bland* and *Hawkins*, Petitioner's claims are directed at two different types of errors. Petitioner challenged the trial court's actions on direct appeal, but attacks the prosecution in seeking habeas relief. The facts supporting both claims were presented on direct appeal, but the claims are still distinct. Second, Petitioner raised other prosecutorial misconduct claims on direct appeal but omitted this specific claim. In *Hawkins*, the Tenth Circuit specifically noted that while the defendant raised one ineffectiveness claim in state court, he did not raise the claim that he presented in his habeas action. The same is true here. Petitioner explicitly brought some prosecutorial misconduct claims but omitted this specific claim, therefore this Court cannot say that Petitioner fairly presented this misconduct claim.

iii.    *Issue G: Prosecutors misrepresented evidence*.

Petitioner claims that the prosecutors misrepresented evidence regarding the necessity of neuroimaging to confirm some of the experts' diagnoses. Petition at 64. While Petitioner discussed the questions and answers regarding neuroimaging at length

on direct appeal, it was within his ineffective assistance of counsel claim. Appl. for Evidentiary Hr'g at 41-44. Like the claims above, Petitioner changed targets, despite relying on the same facts. Petitioner challenged defense counsel on direct appeal, but now he zeroes in on the prosecution. And again, Petitioner did not raise this claim with his other prosecutorial misconduct claims on direct appeal. This claim is not exhausted.

iv. *Issue H: Prosecutors advocated for juror sympathy.*

Petitioner complains that the prosecutors compared Petitioner's plight to the plight of the victim's family in an attempt to elicit juror sympathy. Petition at 65. Specifically, the prosecutor asked during closing argument, "How does that, the fact that you have family and friends, reduce your blame for a crime? Jaime Bolin has a family and friends who loved her, who thought her life had meaning, and they visit a grave." *Id*. While Petitioner challenged this statement on direct appeal, he raised it in his jury instruction claim. Br. of Appellant at 66. Petitioner cannot repackage this quote as a new claim when the state court never had a chance to address it in the proper legal context. The closest that Petitioner came to raising this claim on direct appeal was one sentence in his prosecutorial misconduct claim, in which he argued that the prosecution urged the jury to impose the death penalty out of sympathy. *Id*. at 90. But that sentence contains no discussion, no citation to the offending statement, and is an unadorned allegation tacked on the end of a claim that prosecutors injected their personal opinions into closing arguments. Petitioner did not fairly present the claim to the OCCA.

**1.** Procedural Bar.

Petitioner has not fulfilled the exhaustion requirements of the AEDPA on these four claims.[16] Generally, federal courts will dismiss unexhausted claims without prejudice and allow the petitioner to raise the claim in state court. *Bland*, 459 F.3d at 1012. But when the state court would find the claim procedurally barred under an independent and adequate procedural bar, "there is a procedural default for purposes of federal habeas review." *Id*. Oklahoma does not allow defendants to bring applications for post-conviction relief on issues that a petitioner could have raised "previously in a timely original application or in a previously considered application…." OKLA. STAT. tit. 22, § 1089(D)(8). Petitioner's unexhausted claims arise from the trial court record. Petitioner could have raised the claims either on direct appeal or in his application for post-conviction relief, but failed to do so. Oklahoma law would bar those claims.

The Petitioner attacks the independence and adequacy of Oklahoma's procedural bar based on *Valdez v. Oklahoma*, 46 P.3d 703 (Okla. Crim. App. 2002). Petition at 99-100. Petitioner claims that since *Valdez* gives the OCCA discretion to decide whether to apply the procedural bar, the OCCA necessarily considers the underlying merits of any federal claims before applying the bar. *Id*. Petitioner also argues that this discretion causes the bar to be applied inconsistently. *Id*. at 99. The Tenth Circuit has rejected these arguments several times in recent years. *See Fairchild v. Trammell*, 784 F.3d 702, 719

---

[16] Respondent claims that issue F, which deals with Dr. Meloy's statements about interviewing Petitioner, is unexhausted. While Petitioner did not raise that claim as a prosecutorial misconduct claim on direct appeal, the OCCA explicitly found that the prosecutorial misconduct theory was belied by the record. *Underwood*, 252 P.3d at 245. This Court is hard-pressed to find the claim unexhausted when the OCCA explicitly addressed the claim.

(10th Cir. 2015); *Banks*, 692 F.3d at 1145-46; *Thacker v. Workman*, 678 F.3d 820, 835-36 (10th Cir. 2012). Oklahoma's procedures are both adequate and independent.

Contrary to Petitioner's arguments, appellate counsel ineffectiveness cannot excuse the default. Ineffective assistance of appellate counsel can only serve as cause if the defendant raised that ineffective assistance claim in state court. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Petitioner did not raise appellate ineffectiveness based on omitted prosecutorial misconduct claims in his post-conviction proceeding. Any attempt to raise that ineffectiveness claim in a second post-conviction proceeding would be procedurally barred, as the grounds for that claim would have been apparent at the time the appellate brief was filed. Since appellate counsel ineffectiveness cannot establish cause to excuse the default of the unexhausted prosecutorial misconduct claims, those claims are denied as procedurally barred.[17]

### 2. Exhausted Claims

Petitioner did fairly present several prosecutorial misconduct claims to the OCCA. Petitioner argues that the OCCA unreasonably rejected those claims.

#### i. *Clearly established law.*

Prosecutors can advocate with earnestness and vigor, and are allowed to strike hard blows. *Berger v. United States*, 295 U.S. 78, 88 (1935). But prosecutors may not strike foul blows. *Id*. The line between hard and foul is an uncertain one, and even the

---

[17] Even if these claims were exhausted, the prosecutor's actions were either proper or did not deprive Petitioner of a fair trial. Therefore those claims would fail on the merits.

Supreme Court has admitted that "there is often a gray zone." *United States v. Young*, 470 U.S. 1, 8 (1985). To resolve prosecutorial misconduct claims, courts must first determine whether misconduct even occurred.

If prosecutorial misconduct occurs, it ordinarily warrants habeas relief only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002). This analysis considers the trial as a whole, and factors in the strength of the evidence, cautionary steps to counteract improper remarks, and defense counsel's failure to object. *Id*. The determination of whether the misconduct rendered the trial fundamentally unfair "essentially duplicate[s] the function of harmless-error review." *Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003). If the misconduct deprives a defendant of a specific constitutional right, however, proof that the entire proceeding was unfair may not be necessary. *Paxton v. Ward*, 199 F.3d 1197, 1218 (10th Cir. 1999).

ii.    *Analysis*.

Petitioner claims that the prosecution undermined the presumption of innocence during *voir dire* by implying that he was not actually innocent, just presumed innocent. Petition at 57. During general *voir dire*, the trial court instructed the jury on the meaning of the presumption of innocence, and asked the jury if they were willing to presume Petitioner innocent. Trial Tr. vol. V, 1082-83. Later in *voir dire*, the prosecutor discussed the presumption of innocence, and told the jury that if they had to reach a verdict right then, without hearing any evidence, the verdict would have to be not guilty.

*Id*. at 1163-64.  The prosecutor explained that the presumption is just a presumption, and that it "doesn't mean that he's actually innocent."  *Id*. at 1164.  To illustrate, the prosecutor said that even if a bank robber is caught in the bank, wearing a mask, carrying a gun, and holding the marked bills he had stolen, he is still presumed innocent.  *Id*.  The prosecutor then told the jury that to "erase that presumption, the State has the burden of proof in this case.  We must prove the defendant is guilty beyond a reasonable doubt."  *Id*. At the close of the guilt stage, the trial court instructed the jury on the presumption of innocence.  O.R. 8 at 1453.

The OCCA reviewed the comments for plain error, and did not find them improper.  *Underwood*, 252 P.3d at 249.  The OCCA held that the prosecutor did not argue that the presumption was destroyed or inapplicable, but only explained that the presumption put the evidentiary burden on the State.  This finding is not unreasonable.

The Tenth Circuit encountered a similar claim in *Patton v. Mullin*, where the prosecutor told jurors that the presumption of innocence was just a presumption, and did not amount to actual innocence.  425 F.3d 788, 811-12 (10th Cir. 2005).  While the Tenth Circuit found the comment troubling due to the potential to mislead prospective jurors, the Circuit ultimately denied the claim because the trial court corrected the remark and emphasized that the government bore the burden of proving all elements beyond a reasonable doubt, and that meeting the burden was the only way to overcome the presumption of innocence.  *Id*. at 812.  In this case, like *Patton*, the prosecution said that the presumption of innocence did not mean that Petitioner was actually innocent.  But

both the trial court and the prosecution later accurately described the burden of proof, and emphasized that the State could only overcome the presumption of innocence by convincing the jury of guilt beyond a reasonable doubt. The jury heard the proper standard, and the prosecutor's isolated comment likely had little effect on the trial. This Court cannot say that the OCCA's conclusion was unreasonable.

Petitioner also claims that the prosecution improperly argued that Petitioner did more to the victim than his confession revealed. Petition at 57-58. The prosecutor argued during guilt stage closing that Petitioner "[left] out the part where he shaved her with that blue razor that's sitting next to his computer." Trial Tr. vol. VII, 1853. The prosecutor based this argument on a crime scene investigator's testimony that the victim's "pubic area appeared partially shaven, and saw loose hairs on that area of her body." *Underwood*, 252 P.3d at 249. The OCCA held that the argument was a proper inference based on the evidence at trial and did not create unfair prejudice. *Id*.

Prosecutors are entitled to "comment on and draw reasonable inferences from the evidence presented at trial." *Thornburg v. Mullin*, 422 F.3d 1113, 1131 (10th Cir. 2005). This Court cannot find the prosecutor's inferences in this situation unreasonable. The jury heard that investigators found a blue razor in Petitioner's bedroom, and they heard an investigator testify that while the minor victim had hairs attached to her vaginal area, she had loose hairs around her pubic area, and the area above her vaginal area appeared clean. Trial Tr. vol. VI, 1522. These facts gave the prosecutors a reasonable basis to infer that Petitioner shaved the victim at some point. Just because the medical examiner did not

document that evidence does not change the analysis. An inference need not be supported by every relevant and probative piece of evidence to be reasonable. The OCCA was not unreasonable in denying relief on that issue.

Petitioner claims that the prosecution engaged in theatrics by screaming at the jury and appearing on the verge of tears. Petition at 59. Petitioner claims that the prosecutor's actions improperly focused the jury's attention on the emotion of the case, and not the evidence. *Id*. at 70. The OCCA denied this claim, noting that the prosecutor's argument was directed at the jury, not Petitioner, and while the delivery might have been emotional, it was an emotional case. *Underwood*, 252 P.3d at 250. This Court does not find that conclusion unreasonable. Prosecutors should strive to avoid injecting emotionalism into sensitive cases like this, but the record does not reflect that the prosecutor crossed the line, and the argument did not infect the trial with unfairness.

Petitioner claims that the prosecution improperly questioned Dr. Meloy as to whether he would like to have interviewed Petitioner about his mental diagnoses. *Id*. at 61-63. In discussing the defense experts' diagnoses and his agreement with them, Dr. Meloy commented that "we know that defendants will typically distort information that they're providing to examiners in a forensic setting." Trial Tr. vol. X, 2476. The prosecution then asked "So you would actually like to visit with him yourself?" *Id*. At that point, the defense objected. However, rather than object that the prosecutor had done something improper, defense counsel just asked whether the prosecutor was going to imply that Petitioner should have spoken to Dr. Meloy. *Id*. The prosecutor said no, and

defense counsel said that he objected to any such suggestion. *Id*. The trial court sustained the objection, although it is unclear whether the defense actually objected to the question asked, or just any future questions in that vein. *Id*. at 2477. The prosecutor then asked Dr. Meloy if he would have liked to talk to people who reported Petitioner's life history, specifically telling Dr. Meloy that he was not referring to the Petitioner when he said "other people." *Id*. Dr. Meloy responded that if his role in the case were different, he would have liked to interview Petitioner. *Id*.

The OCCA found that the record belied impropriety on the prosecutor's part. This Court agrees. The prosecutor asked the offending question in response to Dr. Meloy's suggestion that criminal defendants often lie during mental health evaluations. But when the defense objected and the trial court ruled, the prosecutor did not ask any more questions that could impinge on Petitioner's right against self-incrimination. The prosecutor could not anticipate that Dr. Meloy would mention interviewing Petitioner after the prosecutor specifically limited the question to people other than Petitioner. Further, Dr. Meloy's testimony emphasized that his role in the case did not include evaluating Petitioner. The prosecutor did not attack Petitioner's right to remain silent.

Petitioner also complains that the prosecution used Dr. Meloy's comments to undermine the defense experts' diagnoses. That was not improper. Petitioner's test results themselves showed that he was possibly falsifying his answers. Trial Tr. vol. IX, 2166-70. Dr. Meloy testified that defendants often distort information. Trial Tr. vol. X, 2476. The prosecution is entitled to argue that the defense experts' diagnoses relied on

Petitioner's deceit.  That is the adversarial process.  Petitioner has the right for the jury to give his mitigating evidence consideration, not necessarily credit.  The prosecution did not misstate evidence or mislead the jury, therefore they can hardly be faulted for attacking Petitioner's evidence.  The OCCA reasonably found that the prosecutor's actions were proper.

Petitioner finally claims that the prosecutors injected their personal opinions by arguing that death "is the only appropriate and just punishment for the murder of Jamie Bolin," and that death "is the just punishment [Petitioner] has earned."  Petition at 66; Trial Tr. vol. VIII, 1901, vol. X, 2528.  The prosecutor also argued that "[b]ased on what you've heard, justice is death in this case for this defendant.  And anything less, I submit to you, is an injustice.  It's an injustice for this defendant, it's an injustice for Jamie Bolin, and it's an injustice for that family sitting right there."  Trial Tr. vol. X, 2565.

Prosecutors may not "inject their personal opinion on the propriety of the death sentence, but they can argue that "under the facts and the law, capital punishment is appropriate."  *Thornburg*, 422 F.3d at 1135.  In this case, it appears that the prosecution stayed on the proper side of that rule.  The record shows that the prosecutors made the challenged comments directly after explaining what the evidence would show or what the evidence had shown.  Trial Tr. vol VIII, 1901, vol. X, 2527-28, 2565.  The OCCA held that the prosecutors appropriately argued that the evidence supported the death penalty.  *Underwood*, 252 P.3d at 249.  That determination was not unreasonable.

**1.** *Conclusion.*

Four of Petitioner's claims are barred, and Petitioner fails to show that the OCCA unreasonably rejected the exhausted claims. Relief is denied as to Ground Five.

## F. Ground Six: Infirm Jury Instruction.

Petitioner claims that Jury Instruction 12, which defined mitigating circumstances, led the jury to ignore his mitigation evidence. Petition at 72. Petitioner also argues that the prosecutors exploited the instruction to further mislead the jury. *Id*. at 73-74. The instruction at issue states:

> Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case.

> While all twelve jurors must unanimously agree that the State has established beyond a reasonable doubt the existence of at least one aggravating circumstance prior to consideration of the death penalty, unanimous agreement of jurors concerning mitigating circumstances is not required. In addition, mitigating circumstances do not have to be proved beyond a reasonable doubt in order for you to consider them.

O.R. 8 at 1491. On direct appeal, the OCCA held that the instructions did not foreclose consideration of mitigating circumstances and that the prosecutors did not imply "that the jury should ignore any of the evidence offered by [Petitioner] in mitigation of the

sentence," but "merely argued that this evidence did not warrant a sentence less than death." *Underwood*, 252 P.3d at 245.

### 1. *Clearly Established Law.*

Capital defendants are entitled to have their sentencer consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). When a petitioner claims that jury instructions impede that right, courts must ask "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). If there is no such likelihood, the capital sentencing proceeding is not inconsistent with the Eighth Amendment. *Id*.

Courts cannot judge instructions "in artificial isolation," but must view them "in the context of the overall charge." *Id*. at 378 (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)). The Supreme Court has acknowledged a general rule that when (1) a jury hears mitigating evidence, (2) the court instructs the jury to consider all the evidence presented, and (3) the parties address the mitigating evidence in their closing arguments, the jury "is not reasonably likely to believe itself barred from considering the defense's evidence as a factor extenuating the gravity of the crime." *Ayers v. Belmontes*, 549 U.S. 7, 24 (2007) (internal quotations and bracketing omitted).

In *Hanson v. Sherrod*, the Tenth Circuit upheld this specific jury instruction because it allowed the jury to resolve what circumstances were mitigating, other given instructions enumerated specific mitigating circumstances, and other instructions stated that the jury could determine and consider mitigating circumstances other than those enumerated. 797 F.3d 810, 849, 851 (10th Cir. 2015). The Tenth Circuit also held that the prosecutor did not improperly manipulate the instruction, because while he asked whether the circumstances "really extenuate or reduce [petitioner's] degree of culpability or blame in this case," he also "encouraged [the jury] to consider any and all mitigating evidence they thought relevant." *Id*. The Tenth Circuit concluded that "in light of all of the instructions and of the prosecutor's various comments, we find it hard to imagine that the jurors thought they were prohibited from considering any of the mitigating evidence they heard at the resentencing hearing." *Id*. at 852.

### 2. *Analysis.*

Here, as in *Hanson*, the entire panoply of instructions blunted the danger that the jury might think they could ignore the mitigation evidence. Jury Instruction 12 informed the jury that they determined what circumstances were mitigating. O.R. 8 at 1491. Jury Instruction 13 listed fifteen specific mitigating circumstances for the jury to consider, many of which would not necessarily relate to Petitioner's moral culpability. *Id*. at 1492-93. That instruction also allowed the jury to find other unlisted mitigating circumstances, and instructed them to consider those "as well." *Id*. at 1493. Finally, Jury Instruction 20 allowed the jury to consider "sympathy or sentiment for the defendant in deciding

whether to impose the death penalty," giving the jury discretion to give effect to *any* evidence presented, even if its only value was to engender sympathy or sentiment. *Id*. at 1500. The entire charge shows that the trial court properly instructed the jury.[22]

The prosecutors' comments did not undermine those instructions. Prosecutors are "free to comment on the weight the jury should accord to [mitigating evidence]" as long as the jury is properly instructed. *Bland*, 459 F.3d at 1026. The record shows that prosecutors commented on the mitigation evidence, but did not encourage the jury to ignore it. The prosecutors listed the mitigating circumstances and argued that the jury should not give them much weight, but the prosecution did not cross the line and argue that the jury could ignore them. Instead, the prosecutor specifically told the jury that they were the judge of whether the mitigating circumstances were supported by the evidence. Trial Tr. vol. X, 2518. While the prosecutors did ask the jury how the mitigating circumstances reduced the culpability or blame for Petitioner's crimes, those arguments went to how the jury weighed those circumstances. Both the defense and the prosecution discussed the mitigating circumstances in great depth, and although the parties obviously disagreed, the jury could have hardly concluded that they could simply ignore the mitigating evidence.

---

[2]  [2] Petitioner offers *Harris v. Oklahoma*, 164 P.3d 1103 (Okla. Crim. App. 2007), as evidence that Jury Instruction 12 is faulty on its face. In *Harris*, the OCCA noted that this jury instruction was vulnerable to prosecutorial abuse, and recommended changes to the instruction. 164 P.3d at 1114. But the OCCA explicitly stated in *Harris* that the instruction was not constitutionally infirm. *Id*. *Harris* does not lend weight to Petitioner's argument.

"The jury heard mitigating evidence, the trial court directed the jury to consider all the evidence presented, and the parties addressed the mitigating evidence in their closing arguments." *Ayers*, 549 U.S. at 24. The OCCA was therefore not unreasonable in concluding that Jury Instruction 12 and the prosecutors' arguments regarding the instruction did not prevent the jury from considering Petitioner's mitigating evidence. Relief is denied as to Ground Six.

### G. Ground Seven: Inadmissible evidence.

Petitioner claims that the admission of certain pieces of evidence rendered his trial fundamentally unfair. Petition at 80-84. Petitioner specifically complains about a Barbie doll head stuck through with nails and a pin, handcuffs, several sex toys, women's underwear, gruesome books, various knives and swords, barbeque skewers, meat tenderizer, duct tape, a drop cloth, a hacksaw, a toolbox, and pornography videos, all of which the prosecution introduced during the guilt stage. *Id*. at 80-81. The trial court did limit the use of some of these items by allowing their admission, but not their display. Trial Tr. vol. VI, 1547, 1571. In the penalty stage, two computer forensics investigators testified to the contents of some of the pornographic material found on Petitioner's computer. Trial Tr. vol. IV, 1920-26, 1928-30. The trial court also admitted images of pornographic material related to the investigator's testimony. Petition at 80-81.

Petitioner challenged the introduction of the evidence and the testimony of OSBI Agent Anthony Johnston on direct appeal.[18] *Underwood*, 252 P.3d at 243. The OCCA rejected the claim, finding that the evidence was relevant to Petitioner's intent and also corroborated Petitioner's testimony. *Id*. The OCCA further held that the evidence did not prejudice Petitioner, because the evidence of his guilt was overwhelming and the jury did not find Petitioner was a continuing threat, which the vast majority of the evidence was offered to prove. *Id*.

### 1. Clearly Established Law.

Federal habeas courts do not review the propriety of state court evidentiary rulings. *Wilson*, 536 F.3d at 1114. Instead, federal courts only determine whether the admission of evidence violated the Constitution by "so infect[ing] the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." *Id*. (quoting *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994)). This fundamental fairness analysis lacks "clearly definable legal elements," therefore courts must "exercise considerable self-restraint." *Spears v. Mullin*, 343 F.3d 1215, 1226 (10th Cir. 2003) (quoting *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002)). Courts must consider the evidence's effect in the context of the entire second stage. *See id*. This includes considering the relevance of the evidence and the comparative strength of the aggravating and mitigating evidence. *See id*.

---

[18] Respondent claims that Petitioner failed to raise a challenge to Agent Johnston's testimony, but Petitioner's appellate brief fairly presented that issue, albeit briefly. Br. of Appellant at 63. Petitioner did not challenge Agent Dee Cordry's testimony. Due to the ease of disposition, this Court opts to address the merits of that claim. 28 U.S.C. § 2254(b)(2).

## 2. Analysis.

The challenged evidence was relevant because it corroborated Petitioner's detailed confession. Petitioner specifically mentioned the Barbie doll head, handcuffs, sex toys, knife and sword collection, barbeque skewers, meat tenderizer, duct tape, hacksaw, drop cloth, toolbox, pornography, and deviant sexual materials in his confession. State's Ex. 162 at 31-36, 38, 41-44, 64-65, 69, 79. Agents Johnston and Cordry's testimony corroborated Petitioner's discussions of the materials on his computer. *Id*. at 38, 41-44.

The evidence also supported the parties' theories of the case. The images taken from Petitioner's computer, the testimony about the materials discovered on Petitioner's computer, his books, and even the women's underwear supported the prosecution's (and defense's) theories that Petitioner displayed several paraphilia, or sexual deviancies. Trial Tr. vol. IX, 2182-83, 2220. The Barbie doll head, handcuffs, sex toys, skewers, tenderizer, duct tape, drop cloth and hacksaw all reflected Petitioner's planning for the murder. State's Ex. 162 at 31-36, 79. The prosecution relied on the planning element heavily to show that Petitioner would pose a continuing threat under state law, and argued that the evidence of Petitioner's planning presented sufficient evidence to allow the jury to consider the continuing threat aggravator. Trial Tr. vol. VIII, 1866-67.

Finally, the pornography, books, and testimony about the sexual material all revealed Petitioner's mental state, which was a relevant consideration. *See Warner v. Workman*, 814 F. Supp. 2d 1188, 1224-25 (W.D. Okla. 2011). Petitioner's confession detailed his

descent into deviant sexual interests, including cannibalism. State's Ex. 162 at 42-44. The evidence painted an accurate, if disturbing, picture of Petitioner's thoughts, feelings, and actions that led up to his crime.

The relevance of the evidence undermines Petitioner's reliance on *Spears*. In *Spears*, the prosecution introduced gruesome photographs of stab wounds on a victim's body to show conscious pain and suffering, although uncontested testimony showed that the victim lost consciousness before he was stabbed. 343 F.3d at 1227. The photographs had practically no probative value compared to the prejudicial effect. Here, the challenged evidence was relevant to many of the theories in the case, especially the continuing threat aggravator.

Not only was the evidence relevant, but the prosecution's aggravation case was strong. The jury heard overwhelming evidence to find that the murder was especially heinous, atrocious, or cruel, largely independent of the challenged evidence. While the guilt stage evidence was incorporated into the penalty stage, the prosecution did not delve into that evidence with any penalty stage witnesses. The only new information was the testimony regarding the materials found on Petitioner's computer.[19] The prosecutors did not argue that the challenged evidence supported the especially heinous, atrocious, or cruel aggravator, but instead, they relied on Petitioner's own confession that he beat and

---

[19] This fact also distinguishes this case from *Spears*, in which the prosecution waited until the penalty stage to introduce the inflammatory evidence. 343 F.3d at 1228. And while Agents Cordry and Johnston testified in the penalty stage, their testimony was directly relevant to whether Petitioner's sexual deviance made him a continuing threat.

smothered the victim, and was sexually gratified by killing her. Trial Tr. vol. X, 2501-05.[20]

By comparison, Petitioner mounted a weak defense against the especially heinous, atrocious, or cruel aggravator, and instead focused on countering the continuing threat aggravator. His success in defeating that aggravator indicates that the challenged evidence, which showed Petitioner's detailed planning and sexual deviance, had little prejudicial effect. It is unlikely that the challenged evidence had such an effect as to render Petitioner's trial fundamentally unfair. The OCCA's decision was therefore not unreasonable. Relief is denied as to Ground Seven.

**H. Ground Eight: Petitioner's Video-Taped Confession.**

Petitioner claims that police obtained his video-taped confession in violation of his Fifth and Sixth Amendment rights. Petition at 85. The events leading up to this confession are detailed in the statement of facts. *Supra* pp. 2-4. Petitioner claims that he did not voluntarily, knowingly, or intelligently waive his *Miranda* rights because of the coercive atmosphere, a promise of leniency by law enforcement, his isolation, and his mental condition. Petition at 93. Petitioner raised this claim on direct appeal and the OCCA denied the claim, finding that Petitioner voluntarily reinitiated contact with law enforcement and voluntarily waived his *Miranda* rights. *Underwood*, 252 P.3d at 238-39. On post-conviction, Petitioner claimed that appellate counsel was ineffective for not

---

[20] Petitioner claims that the prosecutor pointed to the "salacious evidence" to show that he killed for sexual enjoyment, but the record only reflects that the prosecutor based that argument on Petitioner's own admission of his arousal during the murder. Trial Tr. vol. X, 2505.

arguing that law enforcement should have provided him a lawyer. *Underwood*, No. PCD-2008-604, slip op. at 6-7. The OCCA denied that claim as well, finding that Petitioner failed to show coercion in a legal sense. *Id*. at 7.[21]

### 1. *Clearly established law.*

Custodial interrogation must "be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." *Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981) (citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). If, after being informed of these rights, a defendant invokes his right to remain silent, the interrogation must cease. *Id*. at 482. If the defendant requests an attorney, the interrogation must cease until an attorney is present. *Id*.

A defendant can later waive his rights after invoking them, but the waiver is invalid when police subject a defendant who invoked his right to counsel to further interrogation without counsel present. *Id*. at 484. Police can only resume questioning if the defendant initiates further communication. *Id*. at 484-85. After reinitiating contact, a defendant can then waive his rights under *Miranda*, but the waiver must be voluntary, knowing, and intelligent. *Id*. 483-84. Whether a waiver is voluntary depends on the "particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id*. at 483 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464

---

[21] Petitioner never argued in state court that his mental illness was relevant to whether the waiver was voluntary, knowing, and intelligent. This Court need not decide whether this argument is unexhausted, as the claim is easily disposed of on the merits. 28 U.S.C., § 2254(b)(2).

(1938)).  Law enforcement's use of coercion, deception, or promises of leniency is also relevant.  *United States v. Lopez*, 437 F.3d 1059, 1063-64 (10th Cir. 2006).

    **2.**  Analysis.

Petitioner does not dispute that he asked to discuss the crime with Agents Overby and Maag.  Petition at 90.  There is no dispute then that Petitioner reinitiated contact with law enforcement at that time.  Petitioner only disputes that his choice to reinitiate contact and waive his *Miranda* rights was voluntary, knowing, and intelligent.  *Id*.

Petitioner fails to show that his waiver was not voluntary based on coercion. Petitioner argues that an officer's request for Petitioner to execute a written consent to search was renewed interrogation and amounted to coercion.  *Id*. at 90-91.  The state trial court found this action improper, and the OCCA never addressed the propriety of those actions.  Nevertheless, there is no Supreme Court precedent that characterizes a request for consent to search as interrogation.  In fact, the Tenth Circuit has held that seeking consent for a search is not "interrogation." The term "interrogation" encompasses words and actions that "police should know are reasonably likely to elicit an incriminating response." *United States v. Gay*, 774 F.2d 368, 379 (10th Cir. 1985).  Requests to search generally do not fall in that category, even though the subsequent search may reveal incriminating evidence.  *Id*.; *see also United State v. Rhodes*, 30 F.3d 142, 1994 WL 386026 at *5-6 (10th Cir. 1994) (unpublished table opinion).  The absence of a Supreme Court case on point and the circuit precedent lead this Court to conclude that the OCCA

was reasonable in rejecting any argument that the request for consent to search undermined Petitioner's subsequent *Miranda* waiver.

Petitioner's later conversations with law enforcement also fail to establish coercion. Petitioner does not point to any evidence that officers initiated conversations about his crime. And while Petitioner claims that the environment was coercive because he was isolated in the police station, just being at a police station does not automatically raise coercion concerns; otherwise every suspect being held at a police station would have a colorable coercion claim.[22] Petitioner himself disavowed any coercion or pressure, and instead agreed that everyone had been nice to him. State's Ex. 162 at 2, 6.

Petitioner also fails to show anyone improperly promised him leniency. Petitioner did mention in his interview that some agent said it would "probably [sic] a lot better off for you if you, just cooperated with us and talked right now . . . ." *Id*. at 6. The agent was never identified, and the claim was never corroborated in any way. *Underwood*, 252 P.3d at 238. Even assuming that an agent did make that statement, it is not a promise of leniency. Petitioner claims that the agent told him it would *probably* be better if he cooperated. This falls short of a "promise" that would render the cooperation involuntary. *See United States v. Morris*, 247 F.3d 1080, 1089-90 (10th Cir. 2001) (showing a defendant pictures of cooperative criminals that received lenient sentences was not a promise of leniency); *United States v. Varela*, 576 F. App'x 771, 777-778

---

[22] Petitioner cites *Maryland v. Shatzer*, 559 U.S. 98, 105-07 (2010), to argue that coercion is presumed in such environments. However, *Shatzer* discussed the presumed coercion when police continue to interrogate after the suspect invokes his rights. That is not the case here.

(10th Cir. 2014) (unpublished) (comment that "I think we can…do something" was not a promise of leniency); *compare Lopez*, 437 F.3d at 1064-65 (officer promised leniency by using pieces of paper labeled "mistake," "murder," "6" and "60" to tell a defendant that he could get fifty-four years less in jail by admitting that a killing was a mistake). An unsubstantiated comment that it would probably be better for Petitioner to cooperate is not the sort of promise of leniency that could have overwhelmed Petitioner's will.

Petitioner's complaint that law enforcement held him without providing an attorney is also unpersuasive. Petitioner conflates the Fifth and Sixth Amendments. The Sixth Amendment obligates the government to provide an attorney for future prosecutions, but not until "the initiation of adversary judicial criminal proceedings…." *McNeill v. Wisconsin*, 501 U.S. 171, 175 (1991) (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)). Since Petitioner confessed well before criminal proceedings began, the Sixth Amendment has no application. Rather, Petitioner's claim hinges solely on law enforcement's failure to provide him an attorney after he invoked his Fifth Amendment right to counsel. Under *Miranda*, the police could decide not to provide counsel for a reasonable period of time, so long as they did not question Petitioner during that time. *Miranda*, 384 U.S. at 474. The decision to continue the investigation while Petitioner waited at the station did not run afoul of the Fifth Amendment. Petitioner's decision to talk while still waiting for an attorney does not alter the analysis.

Finally, Petitioner's mental condition does not undermine his waiver. While a factor to consider, there is nothing in the record that would indicate that Petitioner's mental

condition interfered with his ability to waive his *Miranda* rights. Petitioner's video-taped interview revealed that he was engaged, lucid, and extremely detailed. He responded to questions and exhibited no signs of mental impairment. Petitioner claims that he was not able to pick up on the fact that law enforcement just waited for him to talk, but Petitioner's lack of knowledge of their motives, plans, or strategies has no effect on whether he voluntarily, knowingly, and intelligently waived his *Miranda* rights. *See Moran v. Burbine*, 475 U.S. 412, 422 (1986) (information unknown to a defendant can have "no bearing on the capacity to comprehend and knowingly relinquish a constitutional right."). The OCCA's determination that Petitioner's waiver of *Miranda* rights and subsequent confession were valid is reasonable under clearly established federal law. Relief is denied as to the Ground Eight.

## I.     Ground Nine:  Standard for Weighing Aggravating Circumstances and Presumption of Life.

Petitioner claims the trial court violated his constitutional rights by not instructing the jury that they must find beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. Petition at 94. Petitioner also claims that the trial court violated his constitutional rights by not instructing the jury that there is a presumption of life in the sentencing phase. *Id*. at 95. Petitioner raised both claims before the OCCA on direct appeal. *Underwood*, 252 P.3d at 246. The OCCA rejected the claims based on OCCA precedent. *Id*. That decision was not contrary to or an unreasonable application of clearly established federal law.

Petitioner argues that *Apprendi v. New Jersey* and *Ring v. Arizona* require the jury to apply the "beyond reasonable doubt" standard to whether aggravating circumstances outweigh mitigating circumstances, because that finding is a factual predicate for imposing a death sentence. Petition at 94. The Tenth Circuit rejected this same argument in *Matthews v. Workman*, 577 F.3d 1175, 1195 (10th Cir. 2009). The Tenth Circuit characterized the weighing analysis not as a factual finding, but rather a "highly subjective, largely moral judgment regarding the punishment that a particular person deserves." *Id*. (quoting *United States v. Barrett*, 496 F.3d 1079, 1107 (10th Cir. 2007)).

Petitioner argues that the Tenth Circuit was wrong in its analysis. Petition at 94. First, this Court is in no position to grant relief in direct contradiction to binding circuit precedent. Second, even accepting Petitioner's premise, he still fails to show that the OCCA ruled unreasonably by agreeing with the existing federal precedent that directly addresses this issue. Therefore, relief is denied.

Petitioner's other argument is that he was entitled to a jury instruction explaining a "presumption of life." *Id*. at 95. While acknowledging that Tenth Circuit precedent precludes this argument as well, he nevertheless claims that *Apprendi* and *Ring* changed the law by requiring that aggravating factors be proven beyond a reasonable doubt. *Id*. This argument is unpersuasive. In *Smallwood v.Gibson*, the Tenth Circuit held that the Constitution does not require a "presumption of life" instruction. 191 F.3d 1257, 1271 (10th Cir. 1999). The Tenth Circuit further held that even if such a presumption were required, "the instructions given at Mr. Smallwood's trial adequately informed the jury of

this fact." *Id*. at 1271. The Tenth Circuit relied on instructions that told the jury that the defendant was entitled to life unless they unanimously found both that the state had proved at least one aggravating circumstance beyond a reasonable doubt and that the aggravating circumstances outweighed the mitigating circumstances. *Id*. at 1272.

Nothing in *Apprendi* or *Ring* alters the Tenth Circuit's analysis. Petitioner's jury was instructed that unless they unanimously found that the state had proved at least one aggravating circumstance beyond a reasonable doubt, and unless they unanimously decided that the aggravating circumstances outweighed the mitigating circumstances, Petitioner could not receive the death penalty. O.R. 8 at 1484. Factually and legally, *Smallwood* remains applicable and dispositive. The OCCA was not unreasonable in rejecting that claim. Relief is denied on this issue, and on Ground Nine in its entirety.

## J. Ground Ten: Execution of the Mentally Ill.

Petitioner claims that his death sentence violates the Eighth Amendment because he is severely mentally ill. Petition at 96. The OCCA denied this claim on direct appeal. *Underwood*, 252 P.3d at 248. Petitioner raised the issue again in his post-conviction proceeding, arguing that appellate counsel was ineffective for not basing the Eighth Amendment claim on Petitioner's Asperger's diagnosis. *Underwood*, PCD-2008-604, slip op. at 12.[23] The OCCA denied the relief again. *Id*.

---

[23] Petitioner suggests that the OCCA did not address the claim on its merits and confused eligibility to be executed with the insanity defense or his competency to be executed. Petition at 96. But the OCCA's decision on post-conviction very clearly addresses *Atkins*, and found that Petitioner provided no authority for applying *Atkins* to the severely mentally ill. *Underwood*, No. PCD-2008-604, slip op. at 12.

### 1. *Clearly Established Law.*

States cannot execute mentally retarded criminals under *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). The Supreme Court noted in *Atkins* that the Eighth Amendment's prohibition on cruel and unusual punishment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id*. at 311-12 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958)). The Court identified state legislation as the "clearest and most reliable objective evidence of contemporary values," and concluded that the recent consensus showed a trend of states moving away from executing the mentally retarded. *Id*. at 312, 314-17. The Court found that the consensus mirrored the Court's own judgment, as executing the mentally retarded did not serve any retributive or deterrent aims and because mentally retarded criminals face a higher risk of wrongful execution due to their condition. *Id*. at 318-21.

In *Roper v. Simmons*, the Supreme Court similarly found a consensus of states moving away from executing those who committed their crimes as juveniles. 543 U.S. 551, 564-67 (2005). The Court noted that juveniles lack maturity and a sense of responsibility, are susceptible to peer-pressure, and possess less well-formed character and personalities. *Id*. at 569-70. The Court concluded that the trend in the states and the Court's own judgment weighed in favor of barring the execution of juveniles. *Id*. 578-79.

### 2. *Analysis.*

Petitioner claims that his death sentence is cruel and unusual punishment because he is severely mentally ill, not because he is a juvenile or is mentally retarded. But this claim has no basis in precedent and does not rest on the same reasoning as *Atkins* and *Roper*. Namely, there are no relevant state trends. This Court has only located one state that bars the execution of the mentally ill, and that state has ended the death penalty for all future offenses. *The Supreme Court's Evolving Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier,* 50 B.C. L.Rev. 785, 798 & n. 88 (2009); Conn. Gen. Stat. § 53a-35a. This stands in stark contrast to the trends in *Atkins* and *Roper*, where multiple death penalty states ended executions for juveniles and the mentally retarded.

Petitioner rests his argument on the "evolving standards of decency," and asserts that since the Supreme Court bars execution of juveniles and the mentally retarded, it bars the execution of the mentally ill. But this Court can only grant relief if the OCCA's ruling ran afoul of clearly established Supreme Court precedent. There is no Supreme Court precedent to support this claim, and this Court cannot invent clearly established law to counter the OCCA's reasonable decision. Relief is denied as to Ground Ten.

**K. Ground Eleven: Cumulative Error.**

Petitioner claims that even if individual errors in his trial were harmless, these errors were not harmless in the aggregate. Petition at 97-98. Petitioner raised this claim on direct appeal. *Underwood*, 252 P.3d at 254. The OCCA denied the claim because the court did not find any error. *Id*. The cumulative-error analysis addresses the possibility that two or more individually harmless errors might "prejudice a defendant to the same

extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). But the cumulative-error analysis requires at least two errors, and is not warranted when a court only identifies one error. *Hooks v. Workman*, 689 F.3d 1148, 1194-95 (10th Cir. 2012). When the state court does not find error, but the federal habeas court does, the federal court reviews that claim *de novo*. *Lott*, 705 F.3d at 1222-23.

This Court has only identified one error: the sentence recommendations by the victim's family. *Supra* pp. 37-38. With only one error, the cumulative-error analysis is not warranted in this case. Relief is denied as to Ground Eleven.

### V. Motions for Discovery and Evidentiary Hearing.

Petitioner has filed a motion for discovery (Doc. 20) as well as a motion for an evidentiary hearing (Doc. 27). The Court initially denied both motions. Docs 48, 49. After review, the Court sees no reason to change that decision. Petitioner's discovery request is based on generalized suspicions that the prosecutors withheld exculpatory evidence. Petitioner's claims amount to a fishing expedition, searching for materials to support a claim that he has not raised. Petitioner's requested discovery would not affect this Court's conclusion on any of Petitioner's claims. Petitioner has not shown good cause for discovery. *See* Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts (requiring good cause to obtain discovery authorization).

In addition to his discovery request, Petitioner requests an evidentiary hearing with respect to his Grounds One (ineffective assistance of trial and appellate counsel) and

Three (juror dishonesty). Doc. 27 at 3-5. "The purpose of an evidentiary hearing is to resolve conflicting evidence." *Anderson v. Attorney General of Kansas*, 425 F.3d 853, 860 (10th Cir. 2005). If there is no conflict, or if the claim can be resolved on the record before the Court, then an evidentiary hearing is unnecessary. *Id.* at 859. An evidentiary hearing is unwarranted on Grounds One and Three to resolve the legal issues. No information gained from an evidentiary hearing would affect the legal findings on those grounds. Therefore, the requests for discovery and evidentiary hearing are denied.

## VI. Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to the requested relief. Accordingly, Petitioner's Petition (Doc. 19), motion for discovery (Doc. 20), and motion for an evidentiary hearing (Doc. 27) are hereby **DENIED**. A judgment will enter accordingly.

IT IS SO ORDERED this 28th day of July, 2016.

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE